## GEORGE DONNELL v. THE STATE OF MISSISSIPPI.

1. HABEAS CORPUS—PRACTICE.—On the trial of *habeas corpus*, sued out by a person committed, as appears by the return, by the sentence of a justice of the peace, it is competent for the relator to deny the existence of the sentence, the jurisdiction of the justice's court, or the constitutionality of the law under which said judgment and sentence were rendered ; but, in such case, the relator cannot go into the evidence on which he was convicted, with a view to a revision of the question of his guilt. Such revision can occur only on an appeal.

2. CONSTITUTIONAL AMENDMENTS RESPECTING PEOPLE OF COLOR.—The thirteenth, fourteenth and fifteenth amendments of the constitution of the United States are the

logical results of the late civil war, and were intended to put the questions of slavery or freedom, and partial or impartial citizenship and suffrage forever at rest by securing equality of rights to the race of color ; and these amendments, while affirmatory of these rights, are also prohibitory upon the states against their denial or abridgement.

3. " CIVIL RIGHTS " IN MISSISSIPPI.—The Mississippi " civil rights' bill " of February 7, 1873, securing to people of color equal accommodations with white people in public conveyances and places of public entertainment or amusement, is constitutional and valid ; and a judgment and sentence of conviction against the lessee of a theatre for denying admission and equal accommodation to colored men is affirmed.

APPEAL from the judgment of Hon. E. W. CABANISS, Chancellor, upon proceedings of *habeas corpus*.

The facts are fully stated in the opinion of the court.

*Nugent & Yerger*, for the relator.

This is a case arising under what is known as the " civil rights' bill " of the state of Mississippi.

In section ten of the constitution of the state of Mississippi is the following:

" Private property shall not be taken for public use, except upon due compensation first being made to the owner or owners thereof, in a manner to be provided for by law."

Donnell was the door-keeper of the " Angelo Concert Hall," in the city of Jackson, and had purchased the seats in a certain part of the hall. Ham. Carter, a man of color, applied for admission ; this was granted him ; he then demanded a seat in a particular part of the hall. Donnell refused to give him a seat at the place indicated, but offered him a seat in another portion, equally as good. This refusal was extended by Donnell because Carter was a man of color, and in his judgment, as a pecuniary transaction, to give Carter a seat where he desired it, would interfere with the pecuniary value of his other unsold seats.

The hall is shown to be a piece of private property. It is a concert hall, leased out indiscriminately to white

and black.   What is contended for is, that a lessee of the hall for any lawful and legitimate business has a constitutional right to admit or refuse whom he pleases, just as his judgment will indicate the same to be most for his pecuniary interest; and we have high authority for this in the case of the Lord of the Vineyard, mentioned in the Scripture; there the Lord gave to those who had worked but one hour, the same pecuniary compensation which he extended to those who had worked eleven, upon the broad principle which we at once recognize, to wit : that a man has a right to do as he pleases with his own ; to give to whom he pleases, and to refuse whom he pleases, without question.

The common law of the state will not permit one man to interfere with or deprive another man of his property ; and for fear of the interference of the state touching the same, the constitution is framed, and a constant reminder placed there of this great principle in the 10th section, above quoted.

This case is not the case of an inn-keeper.   It is not the case of a common carrier.   It is not the case of an incorporation deriving a charter and special branches of franchise from the state.

It is the naked case of a party carrying on a legitimate business, dealing in an article, not of necessity, but simply of luxury ; an article which he has a constitutional right to sell at any price he pleases, or to whom he pleases.

This thing of taste is a hard thing to manage or control.   It is like kissing; it goes by favor.   It came with heavy force on Dr. Fell, who was not liked ; "the reason why, I cannot tell."

In England, they of refined taste and a disposition to be excluded from our common fellow-beings, demand separation, and therefore it is that the cars on railways are made small and with few seats, that one who desires seclusion may, at a reasonable price, purchase

the use of an entire car. This custom prevails in reference to the private boxes at the theatres; and Donnell acted on this principle; he bought the seats in a certain part of the house. Had a band of wild Indians desired to enter among these seats, he would have refused them to them, because there prevails a prejudice to close proximity to them by the ladies and children of the land.

So again, if a parcel of emigrants, just from a steerage passage, had claimed the right to these seats, they would have been refused to them for this same reason.

Now, this prejudice by the whites to seats with the colored race does, exist. The colored race has just emerged from slavery; the very great bulk of that race have many of the vices contracted in slavery, and and its natural result.

The white race do not desire to drink out of the same vessel, to eat out of the same plate, or to sleep in the same bed with them, or to sit in places of amusement, in the dress circle of theatres with them. And it is as unwise as it is unconstitutional for the legislature of the state to attempt to control those matters of taste by legislative enactment.

In this case, Donnell refused these seats not because of any prejudice on his part, but because it would damage him pecuniarily to grant the same.

*J. S. Morris*, attorney-general.

The thirteenth, fourteenth and fifteenth articles of amendment to the constitution of the United States, and the constitution of this state, in the recent amendments, have, in effect, relieved the colored inhabitants of this state from every stigma of legal inferiority, and made them citizens of the United States and of this state. See Bill of Rights, State Const., art. 1, *passim*; art. 7, § 2.

The object thus intended to be secured to the colored people is civil and political liberty; nothing more, and nothing less.

Montesquieu says that this species of liberty is that tranquillity of mind which arises from the opinion that each person is safe; and that in order to have this liberty it is necessary that the government be so constituted that no one man need be afraid of any other. Spirit of the Laws, book 11, ch. 6.

Prof. Christian, in his notes on Blackstone's Commentaries, says that civil liberty is nothing more than the impartial administration of equal and expedient laws. 1 Black. Com. 127. Locke asserts that it is government by laws established and promulgated, and not to be varied for particular classes or cases, but to have one rule for rich and poor, for the favorite at court, and the countryman at the plow. Civil Government, § 142. This, says Mr. Justice Cooley, is a maxim in constitutional law, and by it we may test the authority and binding force of legislative enactments. Const. Lim. (2d ed.), p. 391. In the case of Lewis v. Webb, 3 Greenl. (Me.) the court say: "It is our boast that we live in a government of laws and not of men; but this can hardly be deemed a blessing unless those laws have for their immovable basis the great principle of constitutional equality."

The equality of all men before God is already as fixed and immutable as His own eternal law. Divine inspiration informs us that He is no respecter of persons.

"For if there come into your assembly a man with a gold ring, in good apparel; and there come in also a poor man in vile raiment;

"And ye have respect to him that weareth the gay clothing and say unto him, sit thou here in a good place; and say unto the poor, stand thou there, or sit here under my footstool;

"Are ye not then partial in yourselves and are become judges of evil thoughts?"

Equality in society, by legal compulsion, is neither to be attained or desired. But, on the contrary, it is one of the chief blessings of civil liberty that, in the social circle, every person shall be free to contribute his influence toward the establishment and enforcement of those unwritten social laws which cultivate refinement, cherish purity of character, develop a love of virtue, and exclude, with an arbitrary hand, all that is coarse, vicious or distasteful.

But it was to establish and secure equality of legal rights—equality of human beings before human laws—that the constitutional amendments I have cited were adopted. Before these amendments were adopted the negro had "no rights which the white man was bound to respect." Scott v. Sandford, 19 How. 393. But by their adoption it has become a part of the supreme law, that not only no slavery shall exist, but that "all persons born or naturalized in the United States are citizens of the United States, and of the state wherein they reside; and no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." And in perfect consonance with these amendments is the first section of the first article of the constitution of this state, which declares that "all persons resident in this state, citizens of the United States, are citizens of the state of Mississippi."

It would be foreign to the present investigation to enter upon any discussion of the necessity, expediency or wisdom of these fundamental provisions. And it is too late now, especially in this presence, to argue that these amendments are valid and obligatory. Before

this tribunal, which, by its very existence, is committed to their validity, these constitutional amendments must be recognized and enforced, not only as organic law, but among the vital principles of civilization. And bearing this in mind, let it also be borne in mind that all titles of nobility are forbidden. Const. U. S., art 1, § 10.

What, then, is the result of this revolution in the constitutional theories of this state and of this republic? It is that a hitherto proscribed caste is brought up to a plane of absolute legal equality with the hitherto dominant caste. It is that another, and perhaps the last remnant of decayed barbarism, has given away and fallen, and that a hitherto humble, trusting, servile and despised, but now free and hopeful, class of humanity have been invited, and have accepted the invitation, to enter the race of life as competitors with the white man for the goal of a higher and nobler civilization; and that, in that race, the new-comer is promised, upon the oath of the white man, that he shall have equal rights, "no abridgement of his privileges and immunities," but, on the contrary, "the equal protection of the laws." Const. U. S., art. 14, § 2.

If there have been mutual jealousies and antipathies between the races, they were naturally to have been expected after such a revolution; and it is a wise policy which seeks to subject these to the restraints of expedient laws, administered with a forbearing and yet with a firm hand, and the strictest impartiality.

I deem it unnecessary, here, to refer to any of the facts and circumstances which induced the passage of the measure recently adopted in this state, under which this prosecution was instituted, commonly known as "the civil rights bill." Suffice it to say that the question of the necessity for, and the wisdom and policy of, this enactment, was before the legislature as a legislative question, and is not, and cannot properly

be, brought before this tribunal as a judicial question.
See Cooley's Const. Lim. 129.

The civil rights, privileges and immunities, which
this act aims at enforcing, are declared in general terms
only, by the federal constitution; and congress is there
authorized to enforce them, in detail, "by appropriate
legislation." This power to enforce, "by appropriate
legislation," these rights, privileges and immunities of
citizenship upon the newly enfranchised class, confers
upon congress a power over the internal and domestic
affairs of the states, which it never before claimed. I
allude to the establishment and enforcement of mere
police regulations, for the preservation of public order
in the states. This power did not before exist in con-
gress. United States v. DeWitt, 9 Wall. 41.

Happily for those who still cling to the constitutional
theory of state rights, the authority of congress to deter-
mine what shall be the "appropriate legislation," and
then to adopt and enforce it as they may think proper,
has not yet been exercised; and the legislature of this
state has sought, by this act, to render any interference
by congress unnecessary.

· But the power thus delegated to congress, by amend-
ing the constitution, was original and inherent in the
states. "In the American constitutional system," says
Cooley, "the power to establish the ordinary regula-
tions of police has been left with the individual states,
and cannot be assumed by the national government."
Const. Lim. 574; United States v. DeWitt, 9 Wall. 41.

Blackstone defines the public police and economy as
the "due regulation and domestic order of the king-
dom, whereby the inhabitants of a state, like members
of a well governed family, are bound to conform their
general behavior to the rules of propriety, good neigh-
borhood and good manners, and to be decent, industri-
ous and inoffensive in their respective stations." 4
Black. Com. 162. Jeremy Bentham, in his general view

of public offenses, has this definition : " Police is a general system of precaution, either for the prevention of crimes, or of calamities. Its business may be distributed into eight distinct branches : 1. Police for the prevention of offenses; 2. Police for the prevention of calamities; 3. Police for the prevention of epidemic diseases; 4. Police of charity; 5. Police of interior communications; 6. Police of public amusements; 7. Police for recent intelligence; 8. Police for registration. Edinburg ed. of works, part 9, p. 157. Note by Cooley, Const. Lim. 572. "It often becomes necessary," says Cooley, "to consider the extent and proper bounds of a power in the states which, like that of taxation, pervades every department of business, and reaches to every interest and every subject of profit and enjoyment. We refer to what is known as the police power.

"The police of a state, in a comprehensive sense, embraces its system of internal regulation, by which it is sought not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizen with citizen those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a like enjoyment of rights by others." Cooley Const. Lim. 572.

"We think it is a settled principle," said Shaw, C. J., in the case of Commonwealth v. Alger, 7 Cush. 84, "growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.  *  *  *  *  *  *  *  Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoy-

ment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution may think necessary and expedient. * * * The power we allude to is rather the police power, the power vested in the legislature, by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth."

Chief Justice Redfield says, that " the perfect right in the legislature to subject persons and property to all kinds of restraint, to secure the general comfort, health and prosperity of the state, was never, and upon acknowledged principles, never can be, brought in question." Thorpe v. Rutland & Bur. R. R. Co., 27 Vt. 149.

" And, of the power of a state legislature to judge of the necessity, wisdom and expediency of such legislation, as well as of their power to so legislate, there can be no doubt. Within the limitations of the constitution the legislative discretion is absolute. Ib.

" The people, in framing the constitution," says Denio, C. J., " committed to the legislature the whole law-making power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden." People v. Draper, 15 N. Y. 543 ; Cooley Const. Lim. 87.

" It has never been questioned, so far as I know," says Redfield, C. J., " that the American legislatures have the same unlimited power in regard to legislation

which resides in the British parliament, except where they are restrained by written constitutions. That must be conceded, I think, to be a fundamental principle in the political organization of the American states."

The principle for construing constitutions, state and federal, is correctly stated by Cooley. "Congress," says he, "can pass no laws but such as the constitution authorizes, expressly or by clear implication; while the state legislatures have jurisdiction of all subjects on which their legislation is not prohibited." Const. Lim. 173; 15 N. Y. 303; 4 Mich. 244; 15 La. Ann. 190; 18 Ind. 256; 17 Cal. 547; 17 Penn. St. 119, and other cases cited by Cooley. Ib.

Upon what principle, then, can the validity of this act be assailed? Are not hotels, public conveyances and places of public amusement proper objects of police regulation, and in the enjoyment of which, order should be preserved, and "the privileges and immunities of citizens not abridged" by the enforcement of forbidden regulations or no regulations at all?

It is very plain, upon admitted facts, that the colored people will have to be either admitted by law to, or excluded by law from, all places of public amusements. Neither the admission nor the exclusion can be effected by mere violence. Does any existing law exclude them? nay, can any law, consistently with the constitutional amendments, exclude them?

If this can be done, either by the legislature or the courts, what, then, becomes of the amendment to the constitution, which says that "no state shall abridge the privileges or immunities of citizens of the United States, nor deny to any person within its jurisdiction the equal protection of the laws?"

Would a law or regulation which should admit to the public theatres and other amusements a part of the white race and a part of the colored race, and exclude

the balance, upon some merely arbitrary rule of discrimination — as, for examples, that none should be admitted except natives of the state, or of certain specified counties in the state, or any other arbitrary rule — would such a law or regulation be valid? If not, why not? Simply because it would strike down the liberty and equality of all whom it excludes, "abridge the privileges and immunities of citizens of the United States," and "deny" to a portion of the people "the equal protection of the laws."

If the colored people shall not be admitted or excluded by the laws, but shall be either admitted or excluded by force and violence, there will be a tendency to a conflict of races, and consequently a plausible pretext for interference by the federal government, by its "appropriate legislation" to "enforce" the constitutional guarantees in favor of "the privileges and immunities" of citizens of the United States, and the rights of all to "the equal protection of the laws."

Nor need there be any further delusion as to the effect of this law upon the social *status* of the respective races. It takes away the question from the mob, and transfers it to the courts. Thus, it seeks only to preserve the peace between two classes, who, whatever may be the real or supposed differences in social rank, are perfectly equal before the laws of God and man.

While, as at present, the scales of justice are held exclusively by men of the white race, let us see to it that they be held in exact equipoise. Inexorable principles, deducible from the late amendments and from our new state constitution, must of course govern, let the result fall where it may. But if there be any discretion for the judiciary, let us, as white men, remember that there is coming a time in the history of this state when the colored race may take a large part in the administration of the laws. At present, party hounds and the demon of prejudice may howl through the legis-

lative halls, but they, as yet, are compelled to stop out-side of the chamber where this tribunal sits.    Would we have them stop there when the negro shall come to sit on this bench ?    Would we have the colored judges, who in the future may minister here, to be liberal to us ?    If we would, let us now, in this the day of our opportunity, be at least just to that race.

SIMRALL, J.:

The relator, George Donnell, states in his petition for the writ of *habeas corpus*, that he is unlawfully de-prived of his liberty by the sheriff of Hinds county; said sheriff claiming to detain and hold him under the judgment of a justice of the peace, imposing a fine of $100 upon him, the relator, for depriving H. C. Carter and D. Webster of their equal rights and privileges, under what is commonly called the " civil rights' bill," passed February 7, 1873, and also ordering that said relator should stand committed to the custody of the sheriff until said fine and costs are paid.    The petition then recites a series of facts (not necessary to be noticed here), which were intended to raise the question whether the relator had done any acts in violation of the statute.

The sheriff made return upon the writ that he held the relator in custody by virtue of the warrant of com-mitment of the justice of the peace, and filed a copy of it as part of his return.    This is an extract from said paper in substance.    George Donnell, being brought before the justice, charged on the affidavit of H. C. Carter with having refused to sell the said Carter a; ticket entitling said Carter to. admission to a public show or theatrical performance, given at a public hall in the city of Jackson, " because said Carter was a man of color, and whereas, upon a due examination of the facts,  *  *  *  I (the justice) having found him guilty as charged of violating the act of 7th February, 1873,

proceeded to pronounce the prescribed penalty." As appears from this extract, the relator was detained in custody, pursuant to a sentence or judgment of a justice of the peace, for a violation of the statute.

On the trial of the *habeas corpus,* the relator might, under section 1410 (Code of 1871), offer evidence to contradict the return, " for such return shall not be conclusive of the facts therein stated."

The writ " extends to all cases of illegal confinement or detention whatsoever." § 1396. How far shall the judge, before whom the relator was brought, proceed in the inquiry whether he is illegally confined or detained ? It was competent for Donnell to have denied the existence of the judgment referred to in the return ; that question would have been disposed of by an examination of the record of the trial before the justice of the peace. It would, also, have been competent to urge that the justice of the peace had no jurisdiction over the offense ; and if that position were well taken, the judgment of conviction would have been void and the detention illegal. The relator might also insist that the act of the legislature has not the validity of law, because of its conflict with the constitution, and therefore what he did was not an offense.

It is manifest that the judge could not hear testimony and inquire whether the relator was guilty of the matters charged against him, or whether there was testimony enough before the justice to have sustained the conviction. This would have been to have tried the original case *de novo.* If the relator had desired a re-trial of his case on its merits, he ought to have appealed to the circuit court. The writ of *habeas corpus* is in nature of a writ of error, in so far as it brings into review the legality of the authority by which the prisoner is confined. If that authority be the conviction by a justice of the peace or by a higher court, of a criminal offense, the judge is confined to the inquiry

whether the conviction be void or not, for the want
of jurisdiction, or whether the fact of which the relator
has been convicted be a crime or not; and he can-
not examine whether the conviction was right or wrong
under the law and evidence.

In our view of the limits of the investigation, at the
hearing of the *habeas corpus,* we must shut out of view
altogether those facts and circumstances admitted or
proved in the trial, which were offered for the purpose
of proving that no offense had been committed, and
therefore the justice of the peace ought to have
acquitted the party.   These facts did not " contradict
the return" upon the writ. · The only question then to
be solved is, whether the conviction and sentence by
the justice was in law a justification of the sheriff to
hold his prisoner.

· Events of such vast magnitude and influence now
and hereafter, have gone into history within the last
ten years, that the public mind is not yet quite
prepared to consider them calmly and dispasionately.
To the judiciary, which ought at all times to be calm,
deliberate and firm, especially so when the public thought
and sentiment are at all excited beyond the normal
tone, is committed the high trust of declaring what are
the rules of conduct: and propriety prescribed by the
supreme authority, and what are the rights of in-
dividuals under them. · As to the policy of legislation,
the judiciary have nothing to do.   That is wisely left
with the law-making department of the government.
A court only consults the policy of a law, as an aid to
attain the legislative meaning and intent.

The 13th, 14th and 15th amendments of the consti-
tution of the United States, are the logical results of
the late civil war, now more distinctly seen than im-
mediately succeeding its termination.   Practically,
slavery had been abolished before the adoption of the
13th amendment.   That truth was fully realized in

this state, for the convention which met in August, 1865, declared that "slavery having been destroyed," it shall not hereafter exist in this state. Lest a question should be made as to the validity of the mode of its destruction, and to make its re-establishment impossible, the 13th article affirms "that neither slavery nor involuntary servitude * * * shall exist within the United States, or any place subject to its jurisdiction."

The 14th amendment, *propria rigore,* incorporates the recently enfranchised colored race into the body of citizenship, by the words, "all persons born in the United States, or naturalized and subject to the jurisdiction thereof, are citizens of the United States, and of the state where they reside." Such constitutional provision was necessary to confer the citizenship, for although the 13th amendment insured perpetual freedom, the colored race would have been left under the operation of the rule declared by the supreme court of the United States, in Dred Scott v. Sanford, that none of the colored race could, as the constitution then was, become citizens of the United States. The article also inhibits the states from abridging the privileges and immunities of citizens of the United States, or to deny to any person within its jurisdiction the equal protection of its laws.

The 15th amendment is: "The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state, on account of race, color, or previous condition." The final section to each of these articles is: "Congress shall have power to enforce this section by appropriate legislation."

The special object of the 15th amendment was to put the right of suffrage forever at rest, so that neither in the politics and legislation of the nation, or the state, could be the irritating subject, as between the

races, be ever agitated. That subject had been left open by the 14th amendment. Prior to the adoption of the 15th article, the power remained with the states to regulate suffrage. The second section of the 14th amendment enacted that " if the right to vote at any election for the choice of electors for president and vice-president of the United States, representatives in congress, or for the executive and judicial officers or members of the legislature, is denied to any of the male inhabitants of the state, twenty-one years of age, being citizens of the United States, * * * the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in the state. Under this section, then, if a state chose to exclude any of its male citizens from the ballot (except for crime whereof the party has been convicted), it could do so, electing thereby to accept a reduced representation.

The danger to be apprehended under the power left with the states, under the fourteenth amendment, was that, in those states where the white race predominated, the ballot might be denied to the colored people ; and that, in those where the colored race was most numerous, the white race might be abridged in the right of suffrage. The fifteenth amendment makes that impossible, and guarantees to all citizens forever the elective franchise.

The fundamental idea and principle pervading these amendments, is an impartial equality of rights and privileges, civil and political, to all " citizens of the United States," and of " the state where they reside," the same measure and rule of right " to vote," the same "protection of life; liberty and property," by "due course of law ; " " the equal protection of the laws to all within the jurisdiction of the state ; " " nor shall the state make or enforce any law which shall abridge the

privileges and immunities of citizens of the United States."

These amendments, whilst affirmatory, and guarantees of certain rights and privileges, are also prohibitory upon the states from the doing of anything to their prejudice and impairment.

A law which would discriminate injuriously against one portion of the citizens, abridging equal civil or political privileges, or which would afford less protection to life, liberty or property, to one class than another, would clearly violate these amendments. Equality of rights, privileges and capacities is the condition of all citizens, established by these organic laws. Special privileges can be conferred upon none, nor can exceptional burdens or restrictions be put upon any.

It is very difficult to define that very large residuum of legislative power which the state has. Cooley on Constitutional Limitations (572) says it has this extent: To make rules for public order; to suppress and punish crime; to prescribe regulations for the intercourse of citizens with each other; to insure good manners and good neighborhood, which may prevent a conflict of rights and insure to each the uninterrupted enjoyment of his own. In Mayor v. Myler, 11 Pet. 102, the supreme court say : " The state has the same undeniabe and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, when that jurisdiction is not surrendered to or restrained by the constitution of the United States." We add, or when not prohibited or excepted out of legislative control by its own constitution. The court further add, " that is not only the right, but the duty of the state, to advance the happiness, the safety and prosperity of its people, and provide for the general welfare, by every act of legislation which it may deem conducive to those ends." The most absolute and unqualified

title to private property is held upon the condition that the owner will so use it as not to encroach upon the rights of others; and the state may rightfully interfere with the owner, so far as to control the use as that it shall not be seriously detrimental to others. Commonwealth v. Alger, 7 Cush. 84.

The utility and expediency of a law is often confounded with the question of its constitutionality. Full and plenary legislative power is inherent in the state, unless surrendered to or prohibited by the federal constitution, or withheld by its own. The state may pass all laws, unless the federal constitution or its own prohibit. The reverse is the rule with congress. The national government has limited powers, consisting of specific grants over particular subjects. A law of congress must be supported by a specific grant of power, or by such incidental power necessary to give efficiency to the specific grant. The large subjects of the general welfare, safety, happiness and prosperity of the people of the state are committed to the legislature, to be advanced and promoted by legislation. If a law comes before the judiciary, touching a subject not given up to the national government, nor prohibited by the federal constitution, nor excepted out of legislative power in the state constitution, shall the judiciary listen to arguments founded upon its supposed inutility or inexpediency? That would involve the monstrous power of the judiciary sitting in review upon the legislative wisdom and discretion. It would be a palpable violation of the third article of the constitution, which prohibits the functionaries of either of these great departments of government, into which its powers are distributed, " from exercising any power belonging to either of the others." In the nature of things, the legislature must judge finally and conclusively of the fitness and adaptation of a law to promote the general

good and happiness of the people, and its conclusion is obligatory upon the courts.

The remedy under our system of free institutions for unwise use of the legislative power is the ballot box. Legislation is submitted at each recurring election to the popular approval or condemnation. The constituent body has thus reserved to itself the ultimate voice to shape public policy and to indicate what is needful for the general welfare.

Upon the taxing power, the most delicate and most liable to be abused, there is no constitutional limitation as to rate, either upon congress or the legislature. Yet the ballot has always been efficient, in the end, to check and restrain abuses.

Guided by the rule, that to determine the validity of an act of the legislature we look not for the grant of power to pass it, but rather to see whether there is a constitutional provision restraining or prohibiting the legislation, let us examine so much of the statute of the 7th of February, 1873, as bears upon this case. The principle is so familiar that it hardly needs to be stated that one part of a statute may be valid whilst another may fall, for conflict with some article of the constitution.

The law amendatory of sections 2731 and 2732 of the Code of 1871, impose more stringent regulations upon inn-keepers, hotel-keepers, common carriers * * and the owners, lessees or managers of theatres, and other places of public resort. It will hardly be denied that the legislature may, if it deems it expedient, pass regulations applicable to each of these subjects.

Among those customs which we call the common law, that have come down to us from the remote past, are rules which have a special application to those who sustain a *quasi* public relation to the community. The wayfarer and the traveler had a right to demand food

and lodging from the inn-keeper; the common carrier was bound to accept all passengers and goods offered for transportation, according to his means. Soo, too, all who applied for admission to the public shows and amusements, were entitled to admission, and in each instance, for a refusal, an action on the case lay, unless sufficient reason were shown. The statute deals with subjects which have always been under legal control.

So much of it as is here involved is to this effect: "That all the citizens of this state, without distinction of race, color, or previous condition of servitude, are entitled to the equal and impartial enjoyment of any accommodation, advantage, * * * privilege, furnished by common carriers, inn-keepers, * * * or by any owner, manager, or lessee of any theatre or other place of popular amusement; and any person who shall violate the foregoing provisions, or who shall deny to, or withhold from any person the enjoyment of any of the foregoing accommodations, * * * privileges, * * * equally and impartially, on any such account, or who shall abridge or infringe the same, or incite thereto," shall incur the penalty denounced in the act. To constitute the offense there must be the denial, abridgment, or impairment of the equal and impartial accommodations mentioned in the statute, because of the "color," or previous condition of servitude of the person who applies.

The relator in his petition for the writ, states that he had been convicted by the justice of the peace, of depriving H. C. Carter and Webster, of the equal enjoyment of their rights under this statute. The return of the sheriff makes specific this general allegation, whereby it appeared that the relator had been found guilty, and so adjudged by the justice, of refusing to sell to H. C. Carter a ticket of admission to a theatrical performance in a public hall in the city of

Jackson, used for that purpose, because said Carter was a person of color.

The intent of the law is, that all persons may have equal accommodations in the vehicles of common carriers, at the inns, hotels, theatres and other public places of amusement, upon the terms of paying the usual prices therefor. If any are excluded, it must not be on account of race.

We see no constitutional objection to that portion of the statute which has application to this case; counsel for the appellant has pointed to none, except the inhibition that private property shall not be taken for public use unless compensation be first made. It is not perceived in what manner this law infringes that section of the bill of rights. The assertion of a right in all persons to be admitted to a theatrical entertainment, and the punishment as an offense the act of the owner, lessee or manager, who denies or refuses to sell a ticket to a person for the reason asserted in these proceedings, in no sense appropriates the private property of the lessee, owner or manager, to the public use.

*Let the judgment be affirmed.*