(86 Misc. Rep. 426)

### PEOPLE on Complaint of WILSON v. SINCLAIR.

(Court of General Sessions, New York County. July 9, 1914.)

1. DISORDERLY CONDUCT (§ 1*)—ELEMENTS OF OFFENSE.
    Laws 1882, c. 410, § 1458, provides that every person in the city and county of New York shall be guilty of disorderly conduct tending to a breach of the peace, who in any thoroughfare or public place shall commit any of the following offenses: "(3) Every person who shall use any threatening, abusive, or insulting behavior with intent to provoke a breach of the peace or whereby a breach of the peace may be occasioned." *Held*, that to sustain a conviction for such offense it must be shown that at the time of its commission accused was in a thoroughfare or public place; that he used threatening, abusive, or insulting behavior, or that such behavior was with intent to provoke a breach of the peace, or that a breach of the peace might thereby be occasioned.

    [Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

2. DISORDERLY CONDUCT (§ 1*)—SERIES OF ACTS—ISOLATION—LAWFULNESS.
    In a prosecution for breach of the peace, the fact that defendant's acts, separately considered, were lawful was no defense where, taken together,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

they are prohibited and amount to unlawful behavior tending to a breach of the peace.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

3. DISORDERLY CONDUCT (§ 1*)—ACTS OF OTHERS.

In a prosecution for conduct tending to create a breach of.the peace, defendant is chargeable, not only with what he personally did, but also with what he directed and caused others to do; his conduct being considered in conjunction with the acts of such others.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

4. DISORDERLY CONDUCT (§ 1*)—ELEMENTS—"THREATENING"—"ABUSIVE."

Laws 1882, c. 410, § 1458, provides that any person who shall use any threatening or insulting behavior with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, shall be deemed guilty of disorderly conduct. *Held*, that the word "threatening" means "indicating or containing a threat or menace, evidencing some impending evil, portending something, the act of menacing or charging or enjoining with menace or with implied rebuke," while "abusive" means "using ill treatment, injurious, improper, hurtful, offensive, reproachful," so that a threat within such act need not be verbal, but may be by act, and this though the act be innocent in itself apart from the attendant circumstances which attach significance.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 8, p. 6965.]

5. DISORDERLY CONDUCT (§ 1*)—ELEMENTS OF OFFENSE.

Where defendant, occupying no relation toward R., whom defendant believed to be responsible for certain public occurrences in another state, severely criticised him in public speech and then sought to reprobate him by parading in processional form in the street with companions, all wearing crape, opposite a building where R. had his office, with knowledge that there would probably be persons there who would resent such conduct and might cause a breach of the peace, defendant and his companions, though intending themselves to act peaceably, were guilty of threatening, abusive, and insulting behavior whereby a breach of the peace might be occasioned in violation of Laws 1882, c. 410, § 1458, declaring that such conduct shall constitute disorderly conduct.

[Ed. Note.—For other cases, see Disorderly Conduct, Cent. Dig. §§ 1–8; Dec. Dig. § 1.*]

Upton Sinclair was convicted of threatening, abusive, or insulting behavior with intent to provoke a breach of the peace, and he appeals. Affirmed.

Charles S. Whitman, Dist. Atty., of New York City (James E. Smith, Dep. Asst. Dist. Atty., of Olean, of counsel), for the People.

Gilbert E. Roe, of New York City, for defendant.

CRAIN, J. This is an appeal from a judgment of a Magistrate's Court convicting the defendant of disorderly conduct tending to a breach of the peace in violation of section 1458 of chapter 410 of the Laws of 1882. The material part of this section provides that:

"Every person in said city and county shall be deemed guilty of disorderly conduct that tends to a breach of the peace, who shall in any thoroughfare or public place in said city and county commit any of the following offenses,

that is to say: * * * 3. Every person who shall use any threatening, abusive, or insulting behavior with intent to provoke a breach of the peace or whereby a breach of the peace may be occasioned."

[1] Before a person can be lawfully convicted of having violated subdivision 3 of this section the evidence must establish: (1) That at the time of the commission of the offense the offender was in a thoroughfare or public place; (2) that he used threatening, abusive, or insulting behavior; and (3) in the alternative that such behavior was with intent to provoke a breach of the peace, or that a breach of the peace might thereby be occasioned. It is not urged that there was any erroneous ruling in the admission or rejection of evidence, and the rightfulness of the judgment of conviction is to be determined by the applicability of subdivision 3 of the section in question to the defendant's behavior as shown by the evidence.

· It appears from the record that at some undisclosed time antedating the defendant's arrest he attended, according to his testimony, a public meeting at Carnegie Hall and there heard a speaker comment on the alleged killing of some women and children during alleged labor troubles in Colorado. The defendant appears to have believed what he heard, and, as a result, to have felt indignation (Sten. Mins. p. 28) against an unidentified Mr. Rockefeller to an extent that for a brief period thereafter he felt, to use his language, "capable of going down to 26 Broadway and *forfeiting* Mr. Rockefeller." S. M. p. 28. Thereafter and on the evening preceding the defendant's arrest there was a called meeting of certain persons (S. M. p. 29), attended by about 60 (S. M. p. 28). Its purpose, according to the defendant, was to consider some methods of peaceable protest (S. M. p. 29), presumably against the conduct of those supposed to have been responsible for the death of the women and children referred to. This meeting was addressed by the defendant, among others. It appears that in his remarks the defendant alluded to his attendance at the meeting at Carnegie Hall, and said in substance that he had heard a story of oppression and brutality, and of the actual physical torture of women and children and of deliberate murder so hideous and revolting that he came away from the Carnegie Hall meeting thrilling with a sense of indignation (S. M. pp. 27, 28), and that he thought that there was at least half an hour when he would have been "capable of going down to 26 Broadway and *forfeiting* Mr. Rockefeller." The defendant testifies that he said this to the public (S. M. p. 28), and that he expressed to the public his abhorrence of acts committed of which no facts had been published (S. M. p. 28), still presumably alluding to such alleged acts of oppression, brutality, and murder.

As explaining what he meant by going down to No. 26 Broadway and "forfeiting" Mr. Rockefeller the defendant says that he proceeded to add in this public address that he knew that if he did that he would only be "piling violence upon violence," an that he would be using some of the methods which he (referring to Rockefeller) was himself using, and that therefore he (the defendant) could accomplish nothing by it (S. M. p. 28). The defendant then proceeded in such public address to say that he in substance soliloquized with himself as follows:

"I will try to think if there is not something that I can do which will *bring home to Mr. Rockefeller's conscience* which will at the same time be dignified, which will be honest and true, and which will contain no element of violence and will not lay me open in any way to the charge of having descended to Mr. Rockefeller's own level." S. M. p. 25

—presumably the alleged level of violence.

During the course of the defendant's address (S. M. p. 28) some one in the audience spoke for about three or four minutes (S. M. p. 29), and said that he believed that the Colorado miners striking were right in resorting to violence, and that his motion would be to proceed to organize a committee to raise funds and go out and fight with the Colorado miners (S. M. pp. 28, 29), and these remarks, according to the defendant, met with the very evident approval of a large number of people present (S. M. p. 29). The defendant says that he then realized (presumably as the result of this speech of the person in the audience) *how serious the matter was to him,* the defendant, and that so realizing it he said:

"If there is anybody here who feels that they want to reply to Mr. Rockefeller's violence with violence *that is their right*, but I don't think that they should come to this meeting, which was called for considering a peaceable method." S. M. p. 29.

The defendant says: That persons came to the "called meeting" who intended *to support* him, the defendant (S. M. p. 29), but that considerably more than half of the audience, after the remarks of the unnamed speaker, were piqued at the defendant's attitude, and withdrew to another room, and that the defendant was left with a comparatively small group of people (S. M. p. 29). That he, the defendant, then talked to such people most *"carefully and precisely"* as to what they were going to do. That in this connection he cautioned them not to speak to any one, not to reply to any *insults,* not *to resist if they were attacked,* not to make any protest, but to go quietly (presumably if placed under arrest), and not to attempt to excite the crowd or appeal to the crowd in any way. S. M. p. 30. That he advised against the carrying of flags or banners. That he recommended the wearing of crape upon the arm. That he said:

"We will go down to that building and we will walk in group quietly up and down the street, and if the crowd becomes so great that we can no longer walk, we will go away until the crowd has dispersed, then we will come back and walk again."

That he begged that if there was any one unable to maintain self-control not to come, and that he urged that if there was any one not in sympathy with this attitude as thus expressed that such a one should not come. S. M. p. 30.

At a little after 10 o'clock on the morning after the called meeting at which the defendant delivered his address and gave his instructions, the defendant appeared on the sidewalk in front of the Standard Oil Company's building at No. 26 Broadway. One or two of his codefendants who had been in attendance at the called meeting referred to preceded him and were already there. He says that at least 20 newspaper reporters got around him as soon as he appeared, and that

8 or 10 camera men began to take pictures, and that in connection with such attempts the camera men began to drive the street boys away, while about 100 people lined up at the curbstone on both sides of the street. That he, the defendant, had announced the fact that he came there to indicate his grief for the killing of 30 or 40 whom he says he believed were deliberately killed in a strike war in Colorado. That he said he was there because of an important purpose, and that he began to walk up and down in front of the premises in question while the other defendants fell in behind him two by two, and that at the time when the trouble occurred he estimated there were about 300 present. That one or more of the defendants carried flags, but that he did not see the flags until after his arrest. That he himself was startled by the flags. That he thought that he had made a mistake in permitting the other defendants to form directly behind him, as he and the others had no permit for a parade. That the carrying of the flags was a misfortune, as they tended to justify interference on the part of the police. That he had thought that there would be no more of a crowd than the police could fairly be expected to handle, and that if there had been a thousand people there, he would have gone away and have had nothing to do with it. S. M. p. 32. That if the police had attended at the beginning there would have been no such crime as they described and no necessity for arresting him (S. M. p. 32), and that it was his opinion that if the condition which prevailed in front of No. 26 Broadway, as described by himself, had prevailed elsewhere over the city, it would have led to Mr. Rockefeller giving way to the Colorado strikers (S. M. p. 38).

One of his codefendants as a witness describes the arresting officer as appearing to be frightened at what was occurring, and says that at one time the crowd surged around the defendant, Sinclair (S. M. p. 36), but that she had seen more dangerous crowds (S. M. p. 35). The arresting officer testified that in his opinion there were more than 1,000 persons present at the time of the defendant's arrest, and that the crowd was increasing all the time. That it blocked the sidewalk and partially the roadway. That the defendant was requested to desist and would not do so and was, in conjunction with his companions, placed under arrest.

One of the occupants of the Standard Oil Company's building testified to seeing the increasing crowds and the defendant and his companions, the way in which they marched, and the banners they carried, one being a white banner with a bleeding heart and four black borders, and that the sidewalk of the street was impassable, and that the occurrences detailed lasted for about half an hour.

The record thus discloses that something had happened in Colorado which the defendant regarded as reprehensible and for which he considered some one in New York at least partially responsible. He wished to publicly rebuke that some one and to influence by such rebuke the conduct of the one rebuked, and having explained by public speech this purpose and the significance of that which he was about to do, he associated with himself others who subordinated themselves to his will and acted pursuant to his directions, and thereupon with

them he and they did that which he so stated he would do, and that which he did, coupled with conditions which it produced and which he intended that it should produce, led to his arrest, trial, and conviction.

[2, 3] The component parts of given conduct may be lawful, and yet these parts, taken in conjunction with each other, may constitute unlawful behavior. If the acts of the defendant, separately considered, were lawful, but in sequence and connection prohibited, he is not exculpated by the intrinsic lawfulness of isolated acts. The defendant, moreover, is chargeable not alone with what he personally did, but with what he directed and caused others to do, and with his conduct as considered in conjunction with the conduct of such others. If the conduct of the defendant considered in connection with the behavior of those who subordinated themselves to his direction falls within the language of the statute he is answerable, although his individual behavior might not otherwise constitute a breach of the law. Moreover, his behavior on the occasion of his arrest is to be considered in the light of that disclosed by the record as having been previously done by him in preparation for that which he did at the time of his arrest, and such behavior is to be interpreted by such acts and by his announced purpose. Its lawfulness or unlawfulness must be determined in part in the light thrown upon it by his preparatory acts and declared aim as revealed by the record. This is so because such prior acts and announced purpose give meaning to conduct which would otherwise be more or less enigmatical, and because he has offered such previous acts and words as an explanation of his behavior.

It follows that, in determining whether or not the defendant's conduct on the occasion of his arrest was, within the language of the statute, threatening, abusive, or insulting behavior on a thoroughfare or public place, done by the defendant with intent to provoke a breach of the peace or of a character whereby a breach of the peace might be occasioned, the court is required to bear in mind that the defendant, purposely to attract a crowd and to express to such crowd and others disapproval of what he charged to be the conduct of a named individual whom the defendant supposed to be in a designated building, went to such building and, accompanied by others whom he had purposely subjected to his will and who submitted to his direction, paraded with them in processional form without official permit to and fro and back and forth on a thoroughfare or public place in front of such given building for about half an hour, wearing crape, while one of his followers carried a banner with an emblem intended to be suggestive and reproachful, and that thereby a crowd of upwards of 1,000 persons gathered, obstructing the sidewalk, while some of such crowd were at variance with others.

[4] The Century Dictionary defines "threatening" in part as indicating or containing a threat or menace, indicating some impending evil. It defines "abusive" in part as using ill treatment, injurious, improper. It defines "insulting" in part as attacking, containing or inflicting insult, derogatory. The Standard Dictionary defines "threatening" in part as portending something. It defines "abusive" in part as hurtful, offensive, reproachful, and it defines "insulting" in part

as conveying or inflicting insult, insolent. Webster, in his dictionary, says in part that threatening is the act of menacing, and to threaten is to charge or enjoin with menace or with implied rebuke. He also says in part that an insult is any gross abuse offered to another, either by words or actions; act or speech of insolence or contempt.

A threat need not be verbal. It may be by act and the act itself may be innocent apart from antecedent circumstances which attach to it a significance. Thus a "blackhander" may, by a seemingly innocent gesture and without the use of a word, do that which imports to an informed onlooker a threat of death, and behavior may be abusive or insulting when regarded in the light of some antecedent explanation of it. Thus a man may say in the presence and hearing of others, "the one whom I shall point to at such a time and place is a liar," and thereupon if at such a time and place he does so point, his action in the light of his antecedent explanation is as significant as though he had made the charge at such time by word of mouth.

A merited rebuke may under circumstances constitute insulting behavior. The defendant intended by his conduct in the presence of others, on the occasion in question, to rebuke and influence by rebuke the conduct of a Mr. Rockefeller. Where one has publicly announced that because of the alleged misconduct of another he is going to do a given thing with a view to rebuking and affecting the conduct of such other and thereupon does the thing which he has previously announced that he will do and does this thing in the presence of others, his behavior is, within the language of the statute, abusive or insulting; abusive because it is injurious and improper; insulting because it is derogatory to the one whose conduct is referred to, and the insult lies in part in the subject-matter of the rebuke and in part in the publicity of its infliction.

The defendant said by his conduct, as interpreted by his language of a named individual:

"I believe you have caused to be done certain abhorent and criminal acts and to stir your conscience and change your conduct I and those with me walk in processional form in front of an office building, believing that the meaning of what we do, having been explained, will be understood by many."

Can it be seriously urged that his behavior is not insulting to the one upon whose conduct he thus animadverts?

If it was abusive and insulting behavior within the meaning of the statute, did the defendant do what he did with intent to provoke a breach of the peace? One of the purposes of an insult is to provoke resentment, and the defendant is presumed to have intended the ordinary and natural consequences of his act. But even if the defendant did not intend to provoke a breach of the peace, it is sufficient, as we have seen, to bring him within the statute if his behavior was such that by it a breach of the peace might be occasioned. It endangered the peace in different ways. Those rightfully passing to and fro impeded by the crowd purposely brought there by the defendant were not unlikely to resent the defendant's conduct, while persons holding contrary views to those of the defendant respecting the conduct of the one who was being made the subject of the defendant's criticism were not

unlikely to resent what the defendant did. The defendant concedes that he anticipated the possibility, if not the probability, of trouble occurring from his behavior.

A recital of the defendant's apprehensions shows that he realized that trouble might result from what he was about to do and subsequently did. His apologies and admissions form a considerable part of his alleged defense. He anticipated that some of his companions at least might lose their self-control. He anticipated that they might be subjected to insults. He anticipated that they might be attacked. He anticipated that there might be interference by the police, and he proceeded to do that which brought about his arrest despite such anticipations. He was apprehensive of himself, of the feelings caused within himself by that which he says he heard at the Carnegie Hall meeting. He was apprehensive of his associates. He recognized the seriousness of the situation by which his address at the called meeting placed him and he was apprehensive of the consequences to himself, his associates and others from what he did, and he was justly apprehensive both because of the wrongfulness and the danger of his conduct.

[5] The law applicable to the case at bar is that where, as in the present case, one occupying no relation towards another which gives him the right to reprobate the conduct of such other does by public behavior reprobate the conduct of such other, not for the purpose of the enforcement of a private right or the setting in motion of legal process against such other or the enactment of legislation, and the one so reprobated is in private and not in public life and is so reprobated with respect to a matter of conduct in private life, and the reprobation consists in part of taunting conduct towards such other in a public place, and is therefore liable in such place to be resented by the one so reprobated or by others in sympathy with him or acting in his behalf, the behavior evidencing such reprobation is unlawful as tending to a breach of the peace, although the immediate acts done may intrinsically be peaceable and the immediate deportment courteous to those in whose presence it takes place. In such a case the circumstance, if it exist, that the conduct reprobated was reprehensible does not legalize the act. This view does not militate against the right of free speech or against the right of assembly, nor is it primarily for the protection of the one reprobated. Its sanction is the public interest in the enforcement of law and the preservation of order.

The defendant does not come within the principle of the cases relied upon as making for his explanation. Thus peaceful picketing is allowed because those who picket have a special interest as distinguished from that of the public in doing what they do for the welfare of those in the occupation to which such pickets belong. They are not allowed to picket because as members of the public they have a grievance, but because they have a special right or interest to protect. Without such they might be adjudged loiterers and obstructers of the highway.

The principle in the case of Lord George Gordon invoked in the defendant's behalf is likewise inapplicable. There the defendant and those accompanying him were engaged in an effort to petition Parlia-

ment for the redress of grievances. They assembled and discussed their grievances, drew up a petition, marched to Parliament and presented it, praying for redress. They were making a lawful appeal to a competent body and the defendant Lord Gordon was properly held not accountable for the acts of. those disassociated from himself and his companions.

In the case of Haywood v. Ryan (Supreme Court of New Jersey, November, 1913, reported in 88 Atl. 820), likewise relied upon by the defendant, the New Jersey statute differed from that applicable in the case at bar, and the point of the decision was that if a person while quietly walking on a street is followed by a crowd without proof as to why he is followed, the mere fact that he is followed by such a number as to obstruct the sidewalk will not support his conviction of being a disorderly person. It is a very different thing to attract a crowd as in the case cited without having done anything to attract it from, as in the case at bar, intentionally drawing a crowd by the employment of unusual dress and behavior preceded by public statement as to the significance to be attached to such dress and behavior.

It follows from what has been said that the defendant's claim that because intrinsically considered that which he individually did on the occasion of his arrest was not prohibited by law is unavailing, and that his further contention that that which he did at that time must be disassociated from his prior acts and announced purpose is also untenable. It is likewise beside the point, as we have seen, whether what he sought to reprobate was or was not reprehensible, or whether the one reprobated by him was or was not responsible for the thing reprobated. Nor was it necessary to establish, as the defendant contends, that the person intended to be threatened, abused, or insulted was present at the time when the threatening, abusive, or insulting behavior was used. It is sufficient if, as in the case at bar, it was done in the presence of those who possibly might communicate it to the one at whom it was aimed. The defendant intended by his conduct in the presence of others on the occasion in question to rebuke and influence by rebuke the conduct of a Mr. Rockefeller. While he concedes that there is such a person, he contends through his counsel that because such person is unidentified in the record, his purpose to so rebuke and so influence such person by what he did cannot be considered upon this appeal. In this he errs. It was not necessary that the identity of the person threatened, abused, or insulted should be disclosed by the record.

The remarks of the learned magistrate in one or two places in the record that there was no threatening, abusive, or insulting behavior on the part of the defendant present no insuperable obstacle to the affirmance of the judgment of conviction. It was a question of law on the facts as established by the evidence whether or not the behavior of the defendant on the occasion in question was or was not threatening, abusive, or insulting within the meaning of the statute. There was, as we have seen, little or no dispute as to the facts, and, resolving all disputed questions in favor of the defendant, his behavior as matter of law was both abusive and insulting. The judgment of conviction being thus that required by the law upon undisputed facts, the

casual expression, made informally during the course and before the termination of the proceeding of an erroneous view of the law by the learned magistrate, is immaterial. His final conclusion was expressed in the judgment. That conclusion was that the defendant had violated upon the occasion named the provisions of the law referred to. Thus, when the time arrived to apply the law to the facts as established by the evidence, he applied it correctly, and the judgment of conviction now appealed from resulted.

Judgment affirmed.