Cortland A. Johnson, J.
The defendants appeal from judgments of the City Court of the City of Long Beach convicting them of disorderly conduct. In the case of each defendant, the information charged that such defendant, on June 21, 1939 in the city of Long Beach, did, with intent to provoke a breach of the peace or whereby a breach of the peace might be provoked, willfully and wrongfully act in a disorderly manner and cause a crowd to collect at certain streets in said city in violation of section 722 of the Penal Law.
At the opening of the trial, the District Attorney moved to amend the information so as to charge violation of subdivisions 2, 4 and 5 of section 722. His motion was granted as to subdivisions 2 and 4 but denied as to subdivision 5. The result was that the defendants went to trial upon a charge that they, with intent to provoke a breach of the peace or whereby a breach of the peace might be occasioned, acted in such a manner as to annoy, disturb, interfere with, obstruct or be offensive to others, or by their acts caused a crowd to collect except when lawfully addressing such a crowd. (Penal Law, § 722, subds. 2, 4.)
*247 Chief Agnew of the Long Beach Police Department testified that at about eight o’clock p.m. on the day in question, about 14 persons, of whom 13 were the defendants subsequently convicted, were proceeding along the sidewalk on the south side of Park Street, in the city of Long Beach, in single file, at a distance of about 10 feet apart. He first saw them when they had reached a point opposite the station house, at which time he said that there were approximately 35 spectators following them either beside or behind them; that there were also about 15 persons on the opposite side of the street who subsequently crossed the street hence increasing the number of spectators to approximately 50. All or nearly all of the defendants were carrying placards advertising a meeting to be held in the city of New York, to be addressed by one Judge Rutherford on the subject “Government and Peace”; that four of the defendants, namely, Messrs. James, Hingle, Nelson and Strohmeier, were carrying banners upon one side of which were the words, “ Religion is a Snare and a Racket”, and on the other side the words, “ Serve God and Christ the King ”. The defendants did not, at any time, stop, but continued walking along the sidewalk in single file approximately 10 feet apart. Noticing that people were following them, chief Agnew approached the apparent leader, flic defendant Kieran, and expostulated with him concerning the wording of the banners above mentioned and remalles which the chief said he heard the four persons carrying the banners make with respect to the Catholic Church and Catholic priests. According to Agnew’s testimony, Kieran and the others told him, in explanation of their banners, that the only thing they had against religion was that, in the Catholic Church, one was required to pay money to the Catholic priests in order to obtain absolution of one’s sins. Clref Agnew knew the defendant Kieran, and asked him why he permitted them to make such remarks, and Kieran replied, in substance, “ It is the truth, isn’t it! ” Agnew then asked Kieran for his permit to hold a parade and Kieran replied that he did not have to have a permit for what they were doing. Agnew insisted that it was a parade and that the defendants were annoying all sorts of religious people by their remarks and that he would have to arrest, them for causing’ a crowd to follow and for denouncing the Catholic Church and the priests, and, as they continued walking along and did not stop, he called the police to arrest them. Apparently, after this occurred, there had gathered an assemblage, stated by Agnew to approximate 125 people. It is fair to assume, however, that there was no such assemblage until this had occurred because, up to that *248 time, the defendants had been moving along the sidewalk and the spectators had been moving also. Agnew testified that he was annoyed by their remarks concerning the Catholic Church and Catholic priests and was told by three or four others that they had also been annoyed by such remarks.
The defense was that the defendants were members of a sect known as Jehovah’s Witnesses who believe in the Bible rather than in organized religion and who preach the gospel from door to door and encourage people to study the Bible; that they were not parading so as to require a permit for that purpose nor were they assembling or gathering a crowd but were moving along the sidewalk in single file, in the manner above stated, with their placards and banners, and handing out folders to passersby calling their attention to the meeting to be held in New York City on the subject “ Government and Peace ” which would be, in fact, a Bible lecture. They denied that they made the remarks testified to by Agnew, denouncing the Catholic Church and Catholic priests, and also denied that any crowd collected until chief Agnew had stopped them and sent for the police to arrest them for parading without a permit.
For the purposes of this appeal, however, we may assume that the court below was justified in accepting the testimony of chief Agnew and the other witnesses for the prosecution. Upon that assumption, the situation is as follows:
Members of a religious sect who believe in the Bible and in teaching the Bible rather than in organized religion were walking along the sidewalk of a street in the city of Long Bearch, at about eight o’clock in the evening, each separated from the other by a distance of at least 10 feet, bearing placards and handing out circulars advertising a lecture in New York City to be given by a leader of their sect, and four of them carrying banners with- the words, ‘ ‘ Religion is a Snare and a Racket ’ ’, on one side, and the words, “ Serve God and Christ the King ”, on the other, and that when remonstrated with with respect to such banners, they explained that their objection to religion was that, in the Catholic Church, one was obliged to pay a priest in order to be absolved of his sins and, for that reason, they denounced that church and its priests. The defendants kept moving at all times, followed or accompanied, or both, by spectators increasing in number to 35 or 50, until they were stopped by chief Agnew when a “ crowd congregated ”, although it may be doubtful whether, before that time, there was such an “ assemblage ” or “ crowd ” as to block the sidewalk or street to the point of interference with or obstruction of traffic.
*249 The defendants contend that they were not guilty of disorderly conduct in violation of subdivision 2 or 4 of section 722 of the Penal Law and that their actions were within the rights guaranteed to them by the Constitution of freedom of religion, of speech, of the press and of assembly. In support of their contention, they cite the well known recent decisions of the United States Supreme Court. (Lovell v. City of Griffin, 303 U. S. 444; Schneider v. State of New Jersey [Town of Irvington]; Young v. People of State of California; Snyder v. City of Milwaukee; Nichols v. Commonwealth of Massachusetts, 308 U. S. 147.) All of those cases involved ordinances which either absolutely forbade the distribution of circulars, pamphlets, etc., on the public streets or in the public places, or prohibited such distribution without first having obtained a permit or license so to do from some municipal officer. The Lovell and Schneider cases involved “ Jehovah’s Witnesses ” as defendants. In the former, the defendants were distributing circulars on the streets advocating their ideas to passersby, without having obtained a permit from the city manager as required by the ordinance, and, in the latter, the defendant called from house to house, both during the day and at night, showing the occupants a so-called “ testimony” and identification card, and leaving or offering to leave booklets, also without having obtained from the chief of police the written permit required by the ordinance. The other cases involved the distribution on the public streets of pamphlets advertising a meeting to discuss the war in Spain (Young), concerning a strike against a market and the position of organized labor with respect thereto, requesting that the market be not patronized (Snyder), and advertising a meeting of protest against the administration of State unemployment insurance (Nichols). Some of the pamphlets were thrown upon the street by those who received them, with resultant littering, more or less, of streets, sidewalks and gutters. In each case, the United States Supreme Court held the ordinance void on its face, because violative of the constitutional guarantees of freedom of speech and of the press, and reversed the convictions. The court said (308 U. S. 147, 160-161):
“ Although a municipality may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion.
‘ ‘ Municipal authorities, as trustees for the public, have the duty to keep their communities’ streets open and available for *250 movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a g*roup of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct Avould not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion. * * *
“In every case, therefore, where legislative abridgement of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preferences or beliefs respecting matters of. public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.”
It was contended in support of the convictions that the motive of the ordinances in question was to prevent the littering of the streets and that the convictions of the defendants was sustained upon the theory that although they, themselves, did not scatter pamphlets in the streets, their action in the distribution of the pamphlets encouraged or resulted in such littering. As to that contention, the court said (pp. 162-164):
“We are of opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press. This constitutional protection does not deprive a city of all power to prevent street litterimr. *251 There are obvious methods of preventing littering’. Amongst these is the punishment of those who actually throw papers on the streets. * * *
“It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places. But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. * * *
“ Conceding that fraudulent appeals may be made in the name of charity and religion, we hold a municipality cannot, for this reason, require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be carried to the homes of citizens; some persons may, while others may not, disseminate information from house to house. Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech and press.”
It is clear from these decisions that an ordinance requiring permission, in advance, to disseminate information and opinion either by speech or by the handing out of pamphlets or the use of placards or the like upon the streets, which are the natural and proper places therefor, is violative of the constitutional guarantees.
Hague v. Committee for Ind. Organization (307 U. S. 496) involved two ordinances of Jersey City, New Jersey, the one forbidding any person to distribute on any street or public place any cards, pamphlets, newspapers, etc., and the other forbidding any public parade or public assembly in or upon the public streets or public parks without a permit obtained from the director of public safety who was authorized to refuse to issue such permit if, after investigation, he should believe it proper to so refuse, provided, however, that the permit should be refused only for the purpose of preventing riots, disturbances or disorderly assemblage. The trial court found that the purposes of the respondents were the organization of unorganized laborers into labor unions so as to exercise collective bargaining for *252 better wages, hours of work and conditions of employment, which purposes were lawful, and that the petitioners had adopted and enforced a deliberate policy of excluding them from Jersey City and interfering with their right of passage upon the streets and accession to the parks of the city, preventing them from distributing circulars, leaflets or handbills which were not offensive to public morals and did not advocate unlawful conduct but were germane to the purposes above stated, and that their distribution was carried out consistently with public order and without molesting individuals or misusing or littering the streets. It was further found that the petitioners had adopted and enforced a deliberate policy of forbidding the respondents from communicating their views concerning the National Labor Relations Act (29 U. S. Code, tit. 29, § 151 et seq.) to citizens of Jersey City by holding public meetings or assemblage and that there was no competent proof that respondents had occasioned any breach of the peace or disorder consequent upon what they said.
The question, therefore, presented was whether freedom to disseminate information about the National Labor Relations Act and to assemble peaceably for its discussion was a privilege or immunity guaranteed by the Fourteenth Amendment of the Federal Constitution. The Supreme Court held it to be clear that the right peaceably to assemble and to discuss such topics and to communicate respecting them either orally or in writing was a privilege protected by the amendment, and that those privileges were infringed by the officials of Jersey City, unless, as contended by them, the city’s ownership of its streets and parks is as absolute as one’s ownership of his own home, carrying with it the right to exclude citizens from the use thereof, or unless, though the city holds its streets in trust for public use, the absolute denial of their use to the respondents was a valid exercise of the police power. This latter assumption the court held was negatived by the findings of fact. Reliance was placed by the petitioners upon the case of Davis v. Massachusetts (167 U. S. 43), wherein an ordinance of the City of Boston was sustained which prohibited, among other things, public speaking on any of the public grounds of the city except under a permit from the Mayor. Davis had spoken on Boston Common without such permit or without applying for it. His contention that the ordinance violated the Constitution was overruled, apparently upon the theory that Boston Common was absolutely under the control of the Legislature. In the Hague case, the Supreme Court, finding it unnecessary to determine whether, on the facts described, the Davis case was *253 rightly decided, concluded that the determination in that case did not govern the Hague case, as the Boston ordinance was addressed to activities other than the exercise of the right of speech and assemblage whereas the Jersey City ordinance dealt only with the exercise of the right of assembly for the purpose of communicating views held by the speakers and was not a general measure to promote public convenience in the use of the streets or parks. In that connection, the court said (Hague v. Committee for Ind. Organization, 307 U. S. 496, 515-516, supra): “ Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.
“We think the court below was right in holding the ordinance quoted in Note 1 void upon its face. It does not make comfort or convenience in the use of streets or parks the standard of official action. It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent ‘ riots, disturbances or disorderly assemblage.’ It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs for the prohibition of all speaking will undoubtedly ‘ prevent ’ such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right. ’ ’
The court, therefore, held both the ordinances in question void as to the respondents and their actions or proposed actions; that the petitioners, therefore, acted unlawfully in preventing the respondents from holding meetings and disseminating information whether for the organization of labor unions or for any other lawful purpose and that, consequently, the decree enjoining the petitioners from interfering with those rights of the respondents to communicate their views, as individuals, to others, on the streets, in an orderly and peaceable manner, was proper and should be sustained.
*254 It, perhaps, becomes necessary to consider the effect of the decision in the Hague case upon the decisions of the New York Court of Appeals with respect to ordinances affecting the use of public streets and public places. The decisions of that court in People ex rel. Doyle v. Atwell (232 N. Y. 96) and People v. Smith (259 N. Y. 48, 263 N. Y. 255) were based at least in part, upon the decision of the Supreme Court in the Davis case (supra). The Atwell case involved an ordinance of the City of Mount Vernon prohibiting the gathering, assembly or congregating of persons in groups or crowds and the holding of public meetings on the public streets of the city without a permit of the Mayor. The Court of Appeals held that the ordinance was a reasonable exercise of the police power over the public streets and was not repugnant to either the State or Federal Constitutions because it did not abridge the right of free speech or assemblage, which rights are subordinate to the public right of travel and may be regulated or prohibited because they tend to obstruct the streets and to destroy, in some measure,' the purpose for which they are dedicated, namely, public travel. The contention of the defendants was that the ordinance was unconstitutional because it abridged the liberty of speech by prohibiting public speaking in the streets. The court found the answer to that contention to be that it merely concerned the use of the public streets and was not directed against free speech which was one of the many constitutional rights the exercise of which on the public streets might be prohibited, citing the Davis case as exposing the fallacy of the defendants’ contention.
The Smith case involved an ordinance of the City of New York which prohibited the holding of religious meetings in the public streets except by licensed clergymen, lay readers and certain others who had obtained a permit from the police commissioner. In People v. Smith (259 N. Y. 48), it was held that the ordinance did not apply to an atheist who preached atheism in the public streets. Not being within the ordinance, therefore, and there being no permit required for political meetings and others of a like nature, which violate no law unless they become a public nuisance or interfere with traffic or the like, his conviction could not be sustained, the court pointing out, however, that if the assembly gathered by him should become disorderly, it might subject him to prosecution for disorderly conduct and, furthermore, that if all other persons except the defendant were permitted to make addresses in the public streets, there might be a serious question of violation of the *255 Fourteenth Amendment of the Federal Constitution guaranteeing equal protection of the law.
The ordinance there in question was subsequently amended to authorize the police commissioner to grant permits to certain persons to preach or expound atheism in the parks, streets and other public places. Again, the defendant refused to apply for a permit and was convicted of expounding* atheism in the street without such permit and he again challenged the constitutionality of the ordinance requiring permits for street speaking from exhorters of atheism and religion but not from speakers on other topics. In People v. Smith (263 N. Y. 255) the court followed the Atwell case in holding that the city might pass an ordinance making it unlawful to hold public meetings upon the public streets without a permit and cited the Davis case in holding that the ordinance was not aimed against free speech but against the manner in which the street might be used. Upon the question of equal protection, the court said (p. 257): “ If a reasonable difference may be found between classes of those who may have permits for street speaking and those who are not required to have such permits, the courts will not upset the legisative classification. Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 59 L. Ed. 628, L. R. A. 1915F, 829; People v. Havnor, 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707. The passion, rancor, and malice sometimes aroused by sectarian religious controversies and attacks on religion seem to justify especial supervision over those who would conduct such meetings on the public streets. That the ordinance does not cover all street meetings is no objection to a reasonable classification. Practical exigencies and common experience may permit the recognition of degrees of harm and the limitation of regulation to classes where the need is deemed to be clearest. Radice v. [People of State of] New York, 264 U. S. 292, 44 S. Ct. 325, 68 L. Ed. 690.”
I cannot escape the conclusion that, insofar as the Federal Constitution is concerned, the decision of the Supreme Court in the Hague case (307 U. S. 496, supra) necessarily affects the above-cited decisions of our Court of Appeals. The Supreme Court clearly and definitely said that although the privilege to use the streets for communication of views is not absolute but must be exercised in subordination to the general comfort and convenience and in consonance with peace and good order, nevertheless, it may not, in the guise of regulation, be abridged or denied. It would seem of necessity to follow from the decisions *256 of the Supreme Court that the right of peaceable assembly and the right to communicate thoughts and discuss questions upon the public streets is a right which may not be denied or abridged by ordinance prohibiting the same or may not be denied or abridged in advance by requiring a permit to exercise such right upon the theory that its exercise may obstruct traffic or tend to breach the peace. Conceding that such might possibly result, nevertheless, a municipality cannot, for that reason, require all those who wish to assemble and discuss matters in the public street to present their subject first to the municipal or police authorities for approval with discretion in the latter to grant or refuse a permit.
In the case under consideration, no such ordinance is involved. The defendants were not charged with violation of any ordinance nor were they convicted of the violation thereof. Indeed, so far as the record shows, there may be no ordinance in the city of Long Beach denying or abridging the rights of the defendants to peaceably assemble and disseminate information in an orderly manner for a lawful purpose. Although the defendants were originally halted by the police chief for their failure to have obtained a permit for a parade, it is obvious that there was no parade and that prosecution for violation of an ordinance forbidding a parade without a permit would be unsuccessful. It is true that the authorities above discussed all relate to ordinances affecting the use of public streets and that such an ordinance is not, in the instant case, directly involved. Those decisions are, however, of the utmost importance in establishing just what rights these defendants had. It seems clear therefrom that they had the right to pass along the sidewalk, carrying placards, distributing pamphlets and disseminating information, so long as they did not do so in a manner tending to a breach of the peace and to obstruction of the public highways. Indeed, it is apparent that this was recognized by the prosecuting authorities and, as a result, they were charged with and prosecuted for disorderly conduct. The question, therefore, is whether their actions did, in fact, constitute a violation of subdivisions 2 and 4 of section 722 of the Penal Law.
In discussing the subject of disorderly conduct, distinction must be made between the cases involving conduct upon private property and conduct upon the public streets or in public places. Many of the authorities cited relate to conduct on private property. A person is guilty of disorderly conduct who, with intent to provoke a breach of the peace or whereby a breach of the peace may be occasioned, acts in such a manner as to *257 interfere with or he offensive to others or causes a crowd to collect except where lawfully addressing the same. A breach of the peace is an offense well known to the common law. It is a disturbance of the public order by an act of violence or an act likely to produce violence or which, by causing consternation and alarm, disturbs the peace and quiet of the community. (People v. Most, 171 N. Y. 423.) But, where such an offense is charged, much must depend upon the time, place and circumstances of the act. Thus, where the disturbance took place in a restaurant without actual annoyance, disturbance or interference with anyone, it cannot be said to constitute disorderly conduct in violation of the Penal Law. (People v. Perry, 265 N. Y. 362.) The same is true of a quarrel between husband and wife in their own apartment with no other persons present (People v. McCauliff, 267 N. Y. 581) and, also, of a conversation over the telephone, the possibility of a breach of the peace being occasioned thereby being too remote. (People v. Monnier, 280 N. Y. 77.) The same rule would apply to the unreported authorities cited by the defendants. (People v. Ludovici, 13 N. Y. S. 2d 88; People v. Guthrie, 26 N. Y. S. 2d 289.) In the Ludovici case, the defendant, like the defendants in the instant case, was a member of Jehovah’s Witnesses. She called at private residences to interest the occupants in her religious belief and on their private property attempted to engage in conversation those who answered the door and to leave printed matter with them. Although the occupants informed her that they were not interested and requested her to leave, she lingered. She spoke, however, only in an ordinary tone of voice and it could not be said that there was an noise, alarm, consternation or disorder to the disturbance of the public and, consequently, nothing tending to a breach of the peace. So, too, in the Guthrie case, the action took place entirely within a private home and the enclosed porch thereof. Following the decisions of the Court of Appeals in the Perry and Mormier cases (supra), the court held that the actions of the defendant within a private home, in the presence of the occupant thereof, only, did not constitute disorderly conduct.
Where, however, the acts take place upon a public street or in a public place, the situation is different. People v. Nixon (248 N. Y. 182) is a leading authority in this State with respect to what constitutes disorderly conduct upon a public street. In that case, 20 persons were arrested while walking on a sidewalk on West 29th Street in the city of New York. The information charged that they used threatening, abusive and insulting behavior with intent to provoke a breach of the peace and *258 whereby a breach of the peace might be occasioned and, while picketing with a number of others, paraded up and down in mass formation, obstructing the sidewalk and causing pedestrians to use the roadway. It appeared from the testimony of the police officer that the defendants were walking four abreast on the sidewalk, which was about 12 feet wide, so that the defendants in their picketing occupied about six feet of the sidewalk, so that the regular amount of traffic was barely getting through and some persons had to enter the roadway. After this had gone on for about 10 minutes, the police officer arrested them. It did not appear that, in their marching, the defendants were not quiet and orderly or that they threatened, abused or insulted anyone on the street. The court said (p. 185):
“ They were guilty, we may well concede, of atrociously bad manners, and they discommoded some other persons lawfully using the street, to the extent that a few pedestrians were caused to enter the roadway. There is no evidence that the persons discommoded showed any particular annoyance. Perhaps bad manners are too usual to evoke unusual irritation or annoyance. As yet bad manners have not been made punishable by imprisonment. The question presented here is whether the defendants’ conduct went beyond mere bad manners and tended towards a breach of the peace.”
The difficulty of defining exactly the kind of conduct which would tend to a breach of the peace was then expressed by the court. It held that he acts complained of must be, at least, such as would reasonably tend to a breach of the peace and that it was of some significance that the statute made “ congregating on the street ” an offense only when the offenders refused to move when ordered by the police. In that case, too, it was urged that picketing in large number near a place of business where a strike is in progress is in itself a threat of violence and invites counter-violence. That, however, said the court, would depend upon the circumstances of the particular case and, in the absence of evidence to show that anyone was threatened or coerced, the court could not infer that the conduct of the defendants was intended as a threat or as an incentive of violence toward others. Hence, the sole question was whether a number of pedestrians walking in an orderly manner, four abreast, on the sidewalk and creating no excitement or disturbance may, without warning, be arrested by the police for disorderly conduct and convicted thereof. In answer to that question, the court said (pp. 187-188): “ To us it seems that there should be no doubt of the answer to that question. *259 Men and women constantly congregate or walk upon the streets in groups, quite oblivious of the fact that in some degree they are thereby causing inconvenience to others using the street. A public meeting may have aroused such interest that groups of men and women continue the discussion while walking up and down the street. Groups linger in quiet social converse after the religious edifice where services have been held is emptied. School children and college youths, laborers, athletic ‘ fans,’ and church members, perhaps even judges, do at times congregate or walk upon the streets in numbers sufficient to cause other pedestrians to stand aside or step into the roadway. Surely such conduct is not always ‘ disorderly ’ and does not always tend to a breach of the peace. The magistrate may draw distinction between innocent and wrongful conduct, but finding of guilt must be based upon logical inference from the circumstances of the case. Of course, no one urges that distinction may be based merely upon difference of social or economic .position. Here the fact, if it be a fact, that the defendants are participants or sympathizers in a labor dispute, is immaterial, since there is no evidence from which any inference may be drawn that their quiet presence in numbers at this particular place was in some way calculated to make the labor dispute orderly. In the absence of evidence that the defendants caused substantial annoyance to others, or persisted in their conduct after protest from others or warning from a police officer, we find the evidence insufficient to sustain the conviction of the defendants in this case.”
In four other cases, however, the convictions were affirmed, the court saying (pp. 188-189):
‘ ‘ In the other four cases the circumstances are different. There the evidence, though meagre and unsatisfactory, yet seems to us sufficient to support a finding that the defendants acted recklessly of the rights and convenience of others, and that their conduct tended to a breach of the peace.
“In all these four cases there is evidence that before the defendants were arrested they were warned by police officers that they must not persist in marching up and down the street in large groups. Police officers are guardians of the public order. Their duty is not merely to arrest offenders but to protect persons from threatened wrong and to prevent disorder. In the performance of their duties they may give reasonable directions. Present at the point where the defendants were congregating they might early sense the possibility of disorder. Even a protest from pedestrians who were annoyed by the defendants’ conduct might be a significant element in deter *260 mining whether persistence in such conduct was wrongful. Enough has been shown in these cases to justify the officers in warning the defendants. Refusal to heed the warning so given; persistence in parading the street in groups thereafter, is, perhaps, so significant of a contumacious disregard of the rights of others that it supports the finding of guilt of the defendants. In these cases the judgments must be affirmed.”
In the instant action, however, it must be noted that the defendants were not charged with a violation of subdivision 3 of section 722, namely, congregating with others on a public street and refusing to move on when ordered by the police. It is noteworthy that in the Nixon case referred to, the significance of this provision as indicating a legislative attempt to make such congregating a criminal offense only when the offender refused to move on when ordered by the police constituted one of the bases of the court’s reversal of the conviction of certain of the defendants who had not been so warned and sustained the conviction of the four defendants who persisted after warning. It was that provision of section 722 which was involved in People v. Hippie (263 N. Y. 242). The court there held that a group of persons congregating on a public street may be dispersed even though their intent is orderly and inoffensive. That was the case of a strike in which the defendant was ordered to move on and refused to do so. Under such circumstances, it might be said that a breach of the peace might have been occasioned.
What will constitute an assemblage or a crowd within the meaning of subdivision 4 of section 722, depends entirely upon the circumstances. To sustain a conviction under that subdivision, there must be some evidence that the defendants did collect a crowd. A crowd is a throng, a great number of persons, a multitude. The word is, at best, indefinite and its meaning is shaped by difference in time and place. (People v. Phillips, 245 N. Y. 401.)
Although People v. Edmondson (168 Misc. 142) involved a prosecution for criminal libel, nevertheless, it has usually been said that the gist of the offense of criminal libel is the tendency to stir up disorder and riot and to provoke a breach of the peace. Thus, the opinion of Judge Wallace in that case is apposite. It involved the publication of violent attacks upon all persons of the Jewish religion. Judge Wallace said (p. 154):
“ There can be no doubt as to the defamatory nature of the publications mentioned in the instant indictment. They are palpably the outpourings of a fanatical and bigoted mind.
*261 “ Nevertheless, they have been circulated for years and have never provoked a breach of the peace in this community, nor, in spite of their virulence, are they apt to.
“ As is so well pointed out in the briefs submitted by amicus curice, it is wiser to bear with this sort of scandaknongering rather than to extend the criminal law so that in the future it might become an instrument of oppression. We must suffer the demagogue and the charlatan in order to make certain that we do not limit or restrain the honest commentator on public affairs.
■ ‘ And when one realizes how many forms of religion might consider themselves libeled and seek legal redress, were our laws so extended, and when we reflect on how our courts might, in such event, find themselves forced into the position of arbiters of religious truth, it is apparent that more would be lost than could be gained by attempting to protect the good name of a religion by an appeal to the criminal law.”
Similar argument was used by Magistrate Pinto in People v. Downer (6 N. Y. S. 2d 566, 567). The charge against the defendant was violation of subdivisions 1 and 2 of section 722. It appeared that he approached a police officer and requested him to recommend a restaurant not owned or patronized by Jews. He said to the policeman: “I am starting a world revolution to kill all the Jews.” He also handed to the officer and another patrolman a pamphlet headed, “ World Revolution against the Jew President, the Jew Governor and the Jew Mayor ”, the contents of which clearly defamed the Jewish race. Both officers were Jews and the place where the conduct occurred was largely populated by Jews! The defendant had distributed about 5,000' copies of the pamphlet. It was contended that the defendant’s acts tended to a breach of the peace upon the theory that distributing pamphlets to a large number of Jews in a Jewish neighborhood would cause serious disturbance. The court said (pp. 267-268) : ‘ ‘ I cannot concur with that view. It is a well known fact that the Jewish people have been persecuted and maligned for centuries. They have been driven from country to country but they have borne these attacks with patience and tolerance. Even if the pamphlet in question had been widely circulated, I have serious doubt that it would have created any disorder among the Jewish population in Coney Island. These scurrilous attacks have been published and broadcast in our own city for years without provoking any breach of the peace, and I do not believe that they are apt to do so at this time.
*262 “The statements contained in the pamphlet are clearly the outpourings of a narrow and bigoted person. This is merely another illustration of the extent to which religious animosities sometimes lead a weak and distorted mind. That the circular in question is insulting, intemperate, and highly reprehensible is beyond question. Nevertheless, the acts and conduct of the defendant do not constitute a violation of Section 722 of the Penal Law, no more so than would be the public utterances during a political campaign by the orators of one party charging that the opposition party is dishonest and the enemy of the public, or any more so than the unjustified and indecent writings and oral declarations made from time to time "against the adherents and disciples of other religious bodies.
“ Under the Constitution of this State, every citizen is entitled to speak freely and to write and publish his sentiments on all subjects and the only responsibility is for the abuse of that right; no law shall be passed that in any way restrains or abridges the liberty of speech or of the press. Article 1, § 8. We have similar provisions in the Federal Constitution. U. S. C. A. Const. Amend. 1. There is no principle under our free democracy that is more firmly entrenched in the fundamental law of the land than the right of free thought and free speech. These liberties are not limited to any particular field. It is because the defendant is a citizen of a free democracy that he is permitted to express himself on all subjects. For this blessing, he should be ever thankful. Instead of that, however, he is endeavoring to incite race hatred and stir up bitterness between people of different religious faiths, thus outraging the traditional American concept of religious freedom and fair play.
‘ ‘ In reaching my conclusion that the defendant was within his legal rights as guaranteed by the State and Federal constitution, I have in mind the recent decision of Judge Wallace of the Court of General Sessions in the case of People v. Edmondson, 168 Misc. 142, 4 N. Y. S. 2d 257 and of the views expressed by the amici curias submitted in support of his decision.”
Thus, it may be seen that on the one hand we have the rights of free speech, press and assembly on the public streets, that is, the right peaceably to assemble and disseminate information or promulgate one’s view orally or in writing for any lawful purpose; on the other, the right of the municipality to regulate the use of the streets so as to prevent obstruction or disorder. The latter right must be reasonably exercised to that end in such a way as not unreasonably to prevent or abridge the exercise of the former. The principle is the same whether *263 regulation be attempted in advance under the ordinance-making power or, as in the instant case, be left to the action of the law-enforcement agencies as and when the event occurs. The difficulty with the former method is that it necessitates the laying down of fixed rules applicable to all cases, while under the later method the circumstances and actual occurrences in each case will form the basis upon which to determine whether the exercise of the constitutionally guaranteed rights exceeds reasonable limitations and violates lawful regulations of the use of the streets.
Thus, in the instant case is presented the question whether the acts of the defendants passed beyond lawful exercise of constitutional rights and into the range of “ disorderly conduct ’ ’. To fix the point of departure from the one to the other is again a difficult question and demands of the court the exercise of the greatest care and consideration. As the United States Supreme Court has said, courts should be most astute in the performance of a task that is delicate and difficult in weighing the circumstances to determine whether an abridgement of the exercise of constitutional rights, so vital to the maintenance of democracy, is justified.
As it is improper to place it within the power of a chief of police or other municipal officer to determine in advance by the issuance or refusal of a permit whether those rights may be exercised, so it is equally improper to place it within the power of such an officer to make a determination binding upon the court with respect to the point at which the exercise of those rights must cease. The question is not whether a particular police officer is annoyed or whether, in his opinion, the acts of the defendants are such as will cause a “ crowd ” to collect or result in a breach of the peace. Hence, the testimony of the police chief that he was annoyed by the remarks of some of the defendants about the Catholic Church and its priests is in noway determinative of the question whether they so annoyed or were so offensive to “ others ” that a breach of the peace would logically follow. The same is true of his personal reaction to the wording of the banners. It still remained the duty of the trial court to determine whether, under all the facts presented, the defendants were guilty beyond a reasonable doubt of “ disorderly conduct”. That court correctly held that they were within their rights in proceeding along the sidewalk in the manner prescribed, bearing placards advertising a meeting and handing out circulars or pamphlets to passersby. But he further held that because four of them carried bannners bearing the words Religion is a Snare and *264 a Racket ”, all were guilty of disorderly conduct because those words could lead only to one thing; riot, incitement, fights, brawls or breach of the peace”.
To be sure, the Court of Appeals, sustaining the New York City ordinance in People v. Smith (supra), found the legislative classification which permitted the requiring of permits to hold street meetings for the purpose of speaking for or against religion not unreasonable because of the history of conflict resulting from divergent religious beliefs. That such conflict has always existed and still exists to a greater or less degree must be conceded. Dissenters and nonconformists there always have been and always will be. They may be but a minority, but are they for that reason necessarily wrong and should they, therefore, be suppressed because, exercising freedom of thought, they find themselves honestly unable to conform to the thought of the then majority which, indeed, tomorrow may be a minority? To that, also, history gives the answer.
In the matter of religious belief, particularly, it seems that one who is strongly convinced that he has found the ‘ ‘ truth ’ ’ becomes irresistibly impelled to bring others into like knowledge of that “truth”. Almost necessarily then he becomes “ intolerant ” of other faiths because they are not the “ true ” faith, and when the adherents of his faith become sufficiently powerful, that intolerance expresses itself in suppression and oppression. Thus, the Catholic Church itself consisted originally of dissenters and nonconformists who were oppressed and martyred for centuries before that church attained ascendancy; and then it, in its turn, passed through the blight of intolerance expressed in the Inquisition. So, too, Luther was a dissenter and nonconformist whose revolt, starting with his attack upon the abuse of the sale of “ indulgences ”, culminated in the establishment of a new church, the predecessor of the Protestant sects of today. And so the cycle continued. "When the Church of England had become the established church of that country, it, in its turn, attempted suppression of all dissent, with the result that they whose belief in freedom to worship according to their own ideas would not permit them to conform, came to this country to exercise that right and founded here their own church. And yet it was not long before even that church become intolerant of such as Anne Hutchinson. Roger Williams and the Quakers.
So it seems that a most difficult lesson to learn is the lesson that intolerance always results, finally, in the defeat of its own ends. But the history of intolerance in religious matters was fresh in the mind's of the makers of our Federal Con *265 stitution. They were convinced that the democracy they sought to create could not survive without freedom of speech, press and religion. The precursors of the French Revolution, especially Voltaire, played their part in teaching that lesson. Voltaire’s fundamental credo was liberty of thought and of speech, and, significantly enough, that credo led him first to attack the established church, its clergy and certain of its dogmas because they hampered that freedom, and from that, of necessity, he passed to the preaching of political liberty.
I know of no better expression of that credo than his words in a letter to Madame du Deffaud which have become the watchword of one of our great newspapers: “ I disapprove of what you say, but I will defend to the death your right to say it.” That expresses the idea which, through Jefferson and others, became a most essential part of our Constitution and Bill of Rights; so essential that even now it is doubtful whether, without it, our form of government could long survive.
These defendants, too, are dissenters and nonconformists. They, too, exercising their individual freedom of thought, are convinced that ‘ ‘ truth ” is in the Bible alone and not in organized religion, that is, the church, and, following the historic cycle, seek to spread that “ truth ” and in so doing, of necessity attack established religions. I think that the Constitution and Bill of Rights are intended to and do guarantee to them the right to do that very thing. There is guaranteed even to the atheist rights equal to those of religious sects in freedom of expressing his views. (People v. Smith, supra.) In spite of expression of opinion in that case as to the reasonableness of legislative classification which would require permits to hold street meetings for or against religion, but not for discussion of other subjects, because street speaking on religion would be more likely to lead to disorder and hence require police protection, I doubt if that can be said to hold true today. Conflict in religious belief is still with us; but so is the race question and the new political ideologies, communism, fascism, nazism, open preaching of which would, in my opinion, be as productive of disorder and even more so than religious preachings. And with us too are the questions of labor relations, the rights of organized labor, the right to strike and to picket. They, surely, have been productive of violence and disorder and yet the courts have been most careful to protect those rights.
Intolerance is still with us also; but if we preach tolerance must we not practice it? To be tolerant of those who are tolerant is not difficult; but is it not better to be tolerant even *266 of intolerance than to attempt to suppress the freedom of the citizen to speak his convictions? If freedom to speak is to be preserved, it must be not merely the freedom of another person to speak that which we approve but to speak even that which we hate. And it is here in this country, which, just now, seems to be the last stronghold of freedom, that the fight to preserve that freedom should be fought to the utmost.
We may well say that these defendants, in the manner in which they exercised their rights, were guilty of lack of manners and of bad taste, but those errors are not to be corrected by convictions for disorderly conduct. The use of the words “ Religion is a Snare and a Racket ” does not conform to our ideas of good taste; but I cannot agree that their use, in conjunction with the words “ Serve God and Christ the King”, so necessarily tend to a breach of the peace as to make the defendants guilty of disorderly conduct. Under the decisions referred to above, they would not have violated the Penal Law had they distributed pamphlets to passersby expressing those sentiments, even in a community hostile to them. Does it become a crime because they carried banners instead? I cannot conceive that, by so doing, they would incite Catholics or members of other established churches to disorder any more than would the circulation of pamphlets viciously attacking the Jews so affect a Jewish community. No violence occurred and none was threatened. There was, in my opinion, no ‘ crowd ’ ’ within the meaning of the statute as defined in People v. Phillips (245 N. Y. 401, supra). There were spectators, to be sure, for there was curiosity to be satisfied, as was natural. But. there was no “ assemblage ” until they were halted by the police whereupon, although protesting that they were acting within their rights, they peaceably submitted.
I am satisfied that their guilt of disorderly conduct was not established beyond a reasonable doubt.
Judgments of conviction reversed, fines remitted and informations dismissed.