THOMAS *v.* STATE

No. 42987 February 17, 1964 160 So. 2d 657

*Carsie A. Hall, Jack H. Young, R. Jess Brown,* Jackson; *Jack Greenberg, Leroy D. Clark,* New York, N. Y., for appellant.

*Joe T. Patterson, Attorney General, Jack A. Travis, Robert G. Nichols, Jr.,* Jackson, for appellee.

Rodgers, J.

An affidavit was lodged with the City Police Court of Jackson, Mississippi, charging defendant Henry J. Thomas with disorderly conduct. The exofficio Justice of the Peace tried defendant and found him "guilty." He appealed to the Hinds County Court. The case was tried anew, with the aid of a jury, and the evidence was recorded. The jury found defendant guilty, and from the sentence of the County Court, he appealed on the record to the Circuit Court. The Circuit Judge entered an order affirming the judgment of the County Court, and from that judgment, the case has been appealed to this Court.

The defendant was charged with violating § 2087.5, Miss. Code 1942, Rec., the pertinent parts of which are as follows:

"Section 2087.5 Disorderly conduct — may constitute felony, when,

"1. Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:

"(1) crowds or congregates with others in or upon * * * any other place of business engaged in selling or serving members of the public * * * and who fails or refuses to disperse and move on, or disperse or move on, when ordered so do to by any law enforcement officer of any municipality, or county, in which such act or acts are committed, or by any law enforcement officer of the State of Mississippi, or any other authorized person * * *

" * * * shall be guilty of disorderly conduct, which is made a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than two hundred dollars ($200.00), or imprisonment in the county jail for not more than four (4) months, or by both such fine and imprisonment * * *".

The record in this case shows that defendant Thomas is a Negro who resides at St. Augustine, Florida. He is a student at Howard University in the City of Washington, D. C. He learned that CORE (an organization known as Congress of Racial Equality) was planning a series of bus rides for the purpose of testing segregation laws, and he volunteered his services as a bus rider. He then received instructions as to how he should act when violence erupted; that he should hold his hands by his side when he was being beaten with bicycle chains. Extraordinary advance publicity was given through the news media, advising the public that various racially mixed groups, calling themselves "freedom riders", were enroute through Georgia, Alabama, and Mississippi, with a "stop over" at Jackson, Mississippi. The law enforcement officers of Alabama became apprehensive to such an extent that officers were assigned to

meet the busses in Atlanta, Georgia, and to ride in the busses as they proceeded across Alabama.

On May 20, 1961, three groups of "freedom riders" reached Montgomery, Alabama, and a race riot occurred on Sunday night, May 21, 1961. The Alabama officers testified upon the trial of the instant case that the racial situation in Alabama was extremely tense. Compare Abernathy v. State (Ala.), 155 So. 2d 586, where it is said "fourteen hundred national guardsmen were on duty."

When the busses in which defendant was a passenger reached Anniston, Alabama, a large group of angry people came up and beat on the bus and cursed the occupants, including the officers in it. People lay on the pavement in front of the bus, and others lay behind the bus, so that the driver could not move without injuring them. Finally, a sufficient number of police arrived to control the crowd. When the bus left, many automobiles followed it until the tires on the bus went down and it was brought to a stop. A large crowd of people went up to the bus and began to curse the occupants. A smoke bomb was thrown into the bus and it caught fire. The police arrived and after they fired their guns, the crowd retreated. The police directed defendant and other members of his party to move out to a place of safety, and they obeyed the officers. An ambulance was brought to the scene and defendant and other occupants of the bus were taken to the hospital. Bus drivers refused to operate the busses occupied by defendant and his group of demonstrators, and defendant went back to New York and regrouped under the leadership of another individual. Defendant again accompanied a racially mixed group of persons on two busses through Alabama and into Mississippi. This time they were accompanied by Highway Patrolmen and a contingency of Alabama National Guard to the Mississippi-Alabama state line.

In the meantime radios broadcast details of the disturbance in Alabama. Television broadcast actual scenes

of the riots throughout Mississippi and Alabama, and newspapers left nothing undone in an effort to tell the Nation the progress of the so-called "freedom riders." A great many agents from the Justice Department preceded the busses and "lined the highways." The people of Mississippi became highly outraged and incensed at what they believed to be an invasion aimed at the tranquillity. of the peace of the people of Mississippi.

The testimony of a banker and an automobile dealer and other prominent citizens of Jackson, Mississippi, indicated that a large percentage of the citizens of Jackson was uneasy, and apprehensive that the activity of the defendant and his companions was likely to incite a riot, particularly in view of the notoriety given the so-called "freedom rider movement."

The Mississippi National Guard and the Highway Patrolmen, armed with shotguns, and using helicopters to fly over the convoy, met the busses at the Mississippi-Alabama state line, for the purpose of protecting the caravan. Thus, this entourage moved from the state line along the highway, preceded by agents of the U. S. Justice Department, toward Jackson, Mississippi. In the meantime, the police department of the City of Jackson had been informed of the progress of the group of racially mixed out-of-state demonstrators, and also of the resentment, apprehension, and fear engendered in the minds of individuals by the invasion, heralded by news media. The police used the local radio to ask citizens to stay away from the area of the bus station. The station was isolated by the police, and a corridor was established around the block in which persons and traffic were required to "move on." Nevertheless, in spite of the precautionary efforts of the police, groups of men began to assemble outside the corridor; windows above the street in airconditioned buildings were opened and it was observed that many persons were peering out of and leaning from the windows. Policemen, who

could be spared from the picket line around the block, were stationed on the ramp outside the bus station and eight or ten within the station. Persons, who did not have a ticket, and those, who could not show that they had business at the station, were required to "move on."

The bus, in which defendant was a passenger, arrived at Jackson, Mississippi's Continental Bus Station at 4:45 P.M., May 24, 1961. The National Guard personnel debarked and moved to their appointed positions outside the bus station. Defendant, in company with his companions, proceeded up the ramp, passed by the colored waiting room, and entered the white waiting room. Nothing was done to prevent or obstruct the group from entering the white waiting room. Captain J. L. Ray was in charge of the police at the station. He followed the defendant into the white waiting room. He testified that many persons got up and moved toward defendant, and that he observed the people were in an ugly mood. He said some of the persons he had required to leave the bus station suggested "if you let us handle this situation, we'll get rid of this out-of-town group coming here, causing all this trouble — ". And he further stated: "As they entered the terminal, feeling that it would be best to get this defendant, Henry Thomas, along with the group he was with, out of the bus station, in order to prevent violence, I approached this group of which Henry was a part, ordered them to move on and move out of the terminal. They acted as though they did not hear me, even though I talked in a loud tone of voice — ". He further said: "I definitely believe that there would have been possibly a riot or some disturbance, and that possibly bloodshed would have taken place." He said: "I gave the order twice, then I asked if they refused to obey the order, at which I received no response." He said: "I was trying to prevent violence", and when defendant refused

to move on, he was arrested. The officer stated he would have been happy to have helped defendant get to wherever he wanted to go.

Testimony shows that Jackson was the destination of defendant, and there is no testimony as to why defendant would not move out of the bus station after having reached his destination, and after having asserted his right to enter the white waiting room.

There were fifteen persons in the group, including defendant, and their names and addresses were as follows: Rev. Grady H. Donald, 1423 Edgehill Avenue, Nashville, Tennessee; John H. Moody, Jr., 917 Wilcox Street, Petersburg, Virginia; John L. Copeland, 2715 Torgett Street, Nashville, Tennessee; Lucretia R. Collins, Fort Bliss, El Paso, Texas; Peter M. Ackerberg, 5424 Arlington Avenue, New York City; Clarence L. Thomas, Jr., 407 East Bradley Street, Champagne, Illinois; Henry J. Thomas, Box 156-A, Elton, Florida; Earnest Patton, Jr., 1429 John Johnson Avenue, Nashville, Tennessee; James L. Farmer, 85 Bedford Street, New York City; John R. Lewis, 1800 White Creek Heights, Nashville, Tennessee; Frank G. Holloway, 917½ Tonty Street, New Orleans, Louisiana; Doris J. Castle, 917 Tonty Street, New Orleans, Louisiana.

## I.

There are two questions presented by the appeal to be determined by this Court, growing out of two areas of legal concept: (1) Did the officer under the conditions here prevailing have the right to arrest the defendant for disorderly conduct within the meaning of § 2087.5, Miss. Code 1942, Rec.; and does the evidence support the conviction? (2) Do the State and Federal Constitutions prevent the conviction of an individual under the circumstances here shown because he claims at the time to be exercising constitutional rights?

The pertinent part of § 2470, Miss. Code 1942, Rec., states: "An officer or private person may arrest any

person without warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in his presence; * * *".

Section 2469, Miss. Code 1942, Rec., states: "Arrests for criminal offenses, and to prevent a breach of the peace, or the commission of a crime, may be made at any time or place."

A breach of the peace was punishable under the common law, and was defined in its broad sense to include any infraction upon the public order and tranquillity by any act or conduct inciting to violence or tending to provoke or excite others to like conduct. 8 Am. Jur., § 3, Breach of Peace, p. 834.

Personal violence was not a necessary element under the common-law definition of breach of the peace. One textwriter points out: "If it were, communities might be kept in a constant state of turmoil, fear, and anticipated danger from the wicked language and conduct of a guilty party, not only destructive of the peace of the citizens but of public morals without the commission of the offense. The good sense and morality of the law forbid such a construction." 8 Am. Jur., Breach of Peace, § 3, pp. 834-835. Moreover, an act which if committed at a certain time and place would not amount to a breach of the peace, may constitute a crime if committed at another time or place under different circumstances, and whether or not the act is a breach of the peace can only be determined in the light of circumstances surrounding the act. State v. Hebert, 121 Kans. 329, 246 P. 507; 48 A. L. R. 81; Davis v. Burgess, 54 Mich. 514, 20 N. W. 540; State v. Reichman, 135 Tenn. 653, 188 S. W. 225; Shields v. State, 187 Wisc. 448, 204 N. W. 486, 40 A. L. R. 945; State v. Christie, 97 Vt. 461, 123 A. 849; 8 Am. Jur., supra, § 4, p. 835; State v. Cooper, 205 Minn. 333, 285 N. W. 903, 122 A. L. R. 727.

Under the pressure of modern metropolitan life, various states have enacted laws on the subject of dis-

orderly conduct. It has been pointed out that under the authority of some of these statutes, the failure to comply with the orders of a policeman, such as an order to move on, or to desist from picketing, may constitute disorderly conduct. See 17 Am. Jur., Disorderly Conduct, § 2, p. 188; Anno. 83 A. L. R. 788; Bennett v. City of Dalton, 25 S. E. 2d 726, 69 Ga. App. 438 (1943); People v. Hipple, 263 N.Y. 242, 188 N. E. 725 (1934); People v. Ward, 287 N.Y.S. 432, 159 Misc. 328 (1936); People, on Complaint of Whelan v. Friedman, 14 N.Y.S. 2d 389, 6 Misc. 2d 271 (1939); People v. Hussock, 23 N. Y. S. 2d 520, 61 S. Ct. 733, 85 L. Ed. 1107 (1940-1941); People v. Kieran, 26 N.Y.S. 2d 291 (1940); People v. Levner, 30 N. Y. S. 2d 487 (1941); People v. Richards, 31 N. Y. S. 2d 457, 177 Misc. 912 (1941); People v. Lo Vecchio, 185 Misc. 197, 56 N. Y. S. 2d 354 (1945); State v. Jasmin, 168 A. 545 (Vt. 1933); People v. Kopezak, 153 Misc. 187, 274 N. Y. S. 629 (1934).

The State of New York has such a law. McKinney's Consolidated Laws of New York, Book 39, Part 1, Penal Law, § 722, Disorderly Conduct, Anno., p. 383. This section makes it a violation of the law to ''(3) Congregate with others on a public street and refuses to move on when ordered by the police; * * *''.

In the case of People, on Complaint of Whelan v. Friedman, 14 N. Y. S. 2d 389 (1939), the Court pointed out that in the prosecution for disorderly conduct by holding a public meeting on the street and refusing to obey a police officer's order to move on, defendant could not successfully claim that his constitutional rights of free speech and to conduct public meetings in the street had been violated.

In the case of People v. Galpern, 259 N.Y. 279, 181 N. E. 572, 83 A. L. R. 785, it was shown that four or five friends were congregating on a public street and an officer directed these persons, including defendant, to move on. The right of the officer to make such an

order was upheld under a statutory provision specifically defining disorderly conduct, including congregation with others, on a public street, and refusal to move on when ordered by police, whereby a breach of the peace may be occasioned. The Court held that the statute applies even though defendant were conducting himself in an orderly and inoffensive manner, and his acts were probably not unreasonable. The Court pointed out that "Police officers are not the final arbiters of the rights of citizens * * * Reasonable discretion must, in such matters, be left to them, and only when they exceed that discretion do they transcend their authority and depart from their duty. The assertion of the rights of the individual upon trivial occasions and in doubtful cases may be ill-advised and inopportune. Failure, even though conscientious, to obey directions of a police officer, not exceeding his authority, may interfere with the public order and lead to a breach of the peace. Then the Legislature may determine whether such conduct is 'disorderly', and shall subject the individual to punishment." See the following cases upholding convictions for congregating with others: Anno. 65 A. L. R. 2d 1152; People v. Bogin, 248 N. Y. 530, 162 N. E. 512; People v. Hipple, 263 N. Y. 242, 188 N. E. 725; People v. Hussock, 6 Misc. 2d 182, 23 N. Y. 2d 520, certiorari denied, 312 U. S. 659, 61 S. Ct. 733, 85 L. Ed. 1107; People v. Garvey, 6 Misc. 2d 266, 79 N.Y.S. 2d 456.

It has been said that the general outline for legislation upon the subject in this country seems to have been furnished by the Statute of 5 George IV, Chap. 83, which was a revision of pre-existing statutes of the same class. See 17 Am. Jur. 187, Note 2, Stoutenburgh v. Frazier, 16 App. DC 229, 48 L. R. A. 220.

In State v. Taylor, 38 N. J. Super. 6, 118 A. 2d 36, the defendant, who used loud and offensive language in interference of the officer in the lawful discharge of his duty, was convicted of assault and battery on a

police officer. Defendant appealed, and the appellate court sustained the holding of the lower court. The record shows that two police officers, patrolling a beat after midnight, noticed a group of people, all Negroes, congregated around parking meters at Springfield Avenue and West Street where their automobile was parked. There had been numerous complaints about theft from parking meters, and so they walked across the street to investigate. While the officers were talking to the group, defendant came upon the scene and pushed his way into the center of the group, demanding to know what was going on. Upon being asked whether or not he belonged to the group, defendant said he did not. Whereupon, he was told that this was police business and that he should be on his way. Defendant refused to move and entered into a tirade against the officers. An altercation ensued, and the Court held, in effect, that failure to obey a police order to move on can be justified only where circumstances show conclusively that the order was purely arbitrary and not calculated in any way to promote public order.

In the instant case, in order for the State to convict under § 2087.5, Miss. Code 1942, Rec., the following elements must be present: (1) There must be a crowding or congregating with others; (2) defendant must be in a place of business engaged in selling or serving members of the public (or in one of the other places enumerated in the statute); (3) there must be an order given to disperse or move on by a law-enforcing officer of a municipality or county; (4) the order must be disobeyed; and (5) the intent to provoke a breach of the peace, or the existence of circumstances such that a breach of the peace may be occasioned thereby.

The record in this case reflects the following: (1) The defendant entered the terminal building in Jackson, Mississippi, on the day in question in the company of others; (2) the terminal is a place of business en-

gaged in serving or selling to members of the public; (3) an officer of the Jackson Police Department ordered defendant to move on out of the area; (4) the defendant refused to obey the officer's orders and (5) the witnesses testified that at the time the defendant and his companion entered the station, the crowd of people already there became antagonistic toward defendant; that if the officer had not acted in ordering defendant to move on, there would have been violence.

It is argued, in effect, that defendant committed no violence and since he was at a place he had a right to be, he did nothing to provoke violence or a breach of peace, therefore, his arrest was illegal, although the officer may have had probable cause to believe other people were about to do violence which was engendered by the fact that he exercised his right to be in the place where he was arrested.

The evidence in this case does not bear out the position assumed by the defendant. The testimony shows that defendant was acting as an agent for an organization known as "CORE"; that this organization desired to test the segregation laws of certain states, and that in order to do so, mixed groups of people were sent into this area after advance extraordinary publicity was given, advising the people in these states that waves of mixed "freedom riders" were enroute to their community. The defendant knew that his activity and participation in a previous "freedom ride" into Alabama had precipitated violence and caused the burning of a bus and the hospitalization of the occupants. Nevertheless, the defendant "regrouped with others" to return to this troubled section of the country again to prove his right, although he knew it was likely to "stir up the people." The evidence shows he expected to cause violence. He expected to be whipped with bicycle chains. In short, he came to Jackson, Mississippi, under the auspices of CORE to show his dis-

approval of segregation laws and to incite violence in a series of incidents rather than as he claimed to prove his right to travel unhampered in interstate commerce. The defendant and his companions obviously realized that such a publicized invasion might create a holocaust and race riot. It is common knowledge that such activity has created serious riots not only in the South but in other sections of the country. (See Note 1.)

The officer in charge at the bus station testified, however, that he knew the situation and repeatedly stated that a riot was believed to be imminent. After the defendant and his group had reached their destination at Jackson, Mississippi, and had proven their right to enter the white waiting room, and the right to assemble, they were requested to "move on". The officer in charge, in an attempt to control the situation at a time when everyone was tense with fear to such an extent that the mere striking of a door with a kodak caused newsmen to jump — had a right to hold one crowd back and tell another crowd or individual to "move on." Suppose the officer had not asked these people to "move on", what then? It is not the business of a peace officer to try a lawsuit, but it is his business to keep the peace. The officer does not have a lawyer walking by his side advising him what to do next, and he cannot have the same calm deliberation as one may enjoy who reads of an incident from a cold, printed page. Nevertheless, an officer is not the final judge of his actions as a peace officer. His conduct is always subject to review.

In Bullock v. Tamiami Trail Tours, Inc., 266 F. 2d 326, a damage suit was brought by certain colored passengers and his "apparently white wife," both of whom were natives of Jamaica, for injuries from an assault which occurred in Florida. The Court pointed out that it was the duty of the bus company to notify foreigners of the custom of segregation in the South, and the Court said with reference to the fact that plaintiff, a colored

man, was sitting in the front part of the bus with a white woman "We can visualize no stronger case than this to show a situation where two bus drivers and the bus company officials should have reasonably anticipated that mischief was hovering about and that the Bullocks were in some danger."

 █ In the case at bar the defendant not only knew the situation but he came to the South for the deliberate purpose of inciting violence, or, as he put it, "for the purpose of testing the Supreme Court decision in regard to interstate travel facilities." He left a trail of violence behind him in Alabama. The jury was, therefore, warranted in finding that he intended to create disorder and violence in Jackson, and that, in fact, disorder and violence were imminent at the time when Thomas refused to obey the police officer's order to move on.

The Legislature may define disorderly conduct and prescribe punishment therefor. This is an offense proscribed by statute or ordinance and is not cognizable as an offense under the common law. When used in the legal sense of conduct prohibited by statute, or ordinance, it has a well-established meaning relating to public peace and good order.

 █ We have reached the conclusion in the instant case that the acts of the defendant, under the circumstances here involved, were sufficient to sustain his conviction under § 2087.5, Miss. Code 1942, Recompiled.

## II.

We consider next the question: Does the claim of defendant that he was exercising his constitutional rights make him immune from arrest and conviction for disorderly conduct under the facts of this case?

The gist of appellant's argument is, first, that the defendant was a traveler in interstate transportation, and, as such, he had the right to use the public facilities offered by the bus company without discrimination, and that, since he had traveled by interstate bus in Jackson,

Mississippi, he was immune from arrest although his acts might have resulted in a breach of the peace.

In the outset, it should be remembered that the police power to preserve the peace and tranquility of the people is reserved in the states subject to limitations imposed by the state and federal Constitutions. See list of cases set out under § 255, 11 Am. Jur., Constitutional Law, p. 986; also 16 C. J. S., Constitutional Law, §177, p. 906, §185, p. 922; Hart v. State, 87 Miss. 171, 39 So. 523; Donnell v. State, 48 Miss. 661; State v. Armstead, 103 Miss. 790, 60 So. 778; State v. J. J. Newman Lumber Co., 102 Miss. 802, 59 So. 923.

The Fourteenth Amendment to the United States Constitution does not take away from states their police power. 11 Am. Jur., §261, Constitutional Law, p. 995; Barbier v. Connolly, U. S. Rep. 113, p. 27 (Cal. 1885).

It is also generally recognized that it is the duty of the states to preserve peace in interstate commerce and that the states have the right to do so under the state police power. If such were not true, the highways throughout this nation would be permanently patrolled with Federal Agents. See 11 Am. Jur., Constitutional Law, §265, p. 1002; State, ex rel., Collins, Atty. Gen. v. Senatobia Blank Book & Stationery Co., 115 Miss. 254, 76 So. 258.

It is pointed out in the case of St. Johnsbury and Lake Champlain R. R. Company v. Hunt, 60 Vt. 588, 15 A. 186, that in order to serve a process issued in a civil action, by which he is commanded to arrest the body of the defendant, a railroad engineer, an officer may lawfully stop a train or cars run by such engineer, for the purpose of making the arrest.

We do not believe the case of Boynton v. Virginia, 364 U. S. 454, cited by appellant, is in point in this case; there the defendant was charged with having violated a trespass statute.

In the case at bar the defendant and his companions had debarked at their destination and had moved into the waiting room; they had passed the ticket window and their business with the bus company was obviously concluded. There was no good reason why defendant should not have obeyed the officer and moved out of the situation which was rapidly deteriorating into serious trouble, unless, of course, the activities of the defendant were designed to aggravate others and incite them to violence. In the present case it is apparent that the officer acted in good faith, and with reasonable cause, to prevent violence.

Feiner v. People of the State of New York, 340 U. S. 315, 95 L. Ed. 295, 71 S. Ct. 303 (1950), is particularly significant and pertinent to the constitutional issues here. A young man was making a speech in a predominantly Negro neighborhood, before a mixed audience of about 95 people, making derogatory remarks concerning public officials and indicating that Negroes should rise up in arms and fight for equal rights. In view of the excitement aroused by his speech, a police officer asked him to stop, he ignored these requests, and was arrested and convicted of disorderly conduct. The New York statute is somewhat similar to Miss. Code §2087.5. The New York Court of Appeals affirmed the conviction. 300 N. Y. 391, 91 N. E. 2d 316. The United States Supreme Court also affirmed. It gave considerable weight to the good faith finding of the trial court that the police officers were justified in taking action to prevent a breach of the peace; that the officers were acting in good faith, motivated solely by concern for preservation of order and protection of the general welfare. The Court then said:

"It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes

incitement to riot, they are powerless to prevent a breach of the peace. Nor in this case can we condemn the considered judgment of three New York courts approving the means which the police, faced with a crisis, used in the exercise of their power and duty to preserve peace and order. The findings of the state courts as to the existing situation and the imminence of greater disorder coupled with petitioner's deliberate defiance of the police officers convince us that we should not reverse this conviction in the name of free speech.''

We think *Feiner* is in point and applicable here.

In the case of Taylor v. Louisiana, 370 U.S. 154 (1962), six Negroes were convicted in the state court of violating Louisiana's breach-of-the-peace law, and were fined and sentenced to jail. Four of them went into a waiting room customarily reserved for white patrons at a bus depot and when requested by police to leave, they refused to do so, claiming they were interstate passengers. The other two were arrested while sitting nearby in an automobile which had brought the six to the bus station. There was no evidence of violence before, but the trial court said that the mere presence of Negroes in the white waiting room was likely to give rise to a breach of the peace and was sufficient evidence of guilt. The two petitioners sitting nearby in an automobile which had brought the six to the bus station were convicted of counselling and procuring the first four to violate the law. In that case there was also testimony that immediately upon petitioner's entering the waiting room, many of the people there became restless and some onlookers climbed in the seats to get a better view. These persons, however, moved, on order of the police. There was no evidence of violence. The record shows that the petitioners were quiet, orderly and polite. The trial court said, however, that "the mere presence of Negroes in a white waiting room was likely to give rise to a breach of the peace.'' The United States

Supreme Court said: ''Here, as in *Garner v. Louisiana*, 368 U. S. 157, the only evidence to support the charge was that petitioners were violating a custom that segregated people in waiting rooms according to their race, a practice not allowed in interstate transportation facilities by reason of the federal law.'' The conviction of the defendants was reversed.

The difference between the facts in *Taylor* and the instant case is obvious. There was no evidence to support the charge in that case, whereas in the instant case the evidence is overwhelming that the officer acted under the police power of the State of Mississippi to preserve the peace. It is one thing to say the interstate transportation cannot be segregated and an entirely different thing to say that people may incite violence by fanfare and action calculated to incite violence.

The desire of the courts to protect the constitutional rights of individuals should not result in curtailing, or taking from the states the right and duty to preserve the peace. Beer Company v. Mass., 97 U. S. 25 (1877).

In Garner v. Louisiana, 368 U. S. 157, 7 L. Ed. 2d 207, 82 S. Ct. 248 (1961), there was a consolidated appeal from convictions in a Louisiana court under that state's breach of the peace statute. It defined disturbing the peace as ''the doing of any of the following in such a manner as would foreseeably disturb or alarm the public: * * * (7) Commission of any other act in such a manner as to unreasonably disturb or alarm the public.''

In *Garner*, two Negro students took seats in the lunch counter of a drug store in Baton Rouge. In *Briscoe*, the lunch counter at which seven students sought service was in the restaurant section of the Greyhound Bus Terminal in Baton Rouge. In *Hoston*, seven Negro students took seats at a lunch counter in Kress's Department Store in Baton Rouge. In all except *Hoston*, the management did not ask the defendants to leave.

The manager at Kress's called the police, they arrived, and ordered the students to leave. Petitioners did nothing except ask for service, and the arresting officer said he "believed they were disturbing the peace by sitting there." When they declined to obey the order to leave, they were placed under arrest by the officer.

The Court held that the convictions were so totally devoid of evidentiary support as to render them unconstitutional, under the Due Process Clause of the Fourteenth Amendment; that they did not rest upon any evidence which would support a finding that the defendants had caused a disturbance of the peace. The Court assumed that the Louisiana courts might construe the statutes to encompass the traditional common-law concept of disturbing the peace, and permitted the police to prevent an imminent public commotion, even though caused by peaceful and ordinary conduct on the part of the accused, but the court pointed out that the defendants made no speeches, carried no placards, and did nothing beyond their mere presence at the lunch counter to attract attention to themselves or others. The manager of Kress's testified that he "feared some disturbance might occur." However, this fear was completely unsubstantiated by the record. The Court pointed out that the police "who arrested the petitioners were left with nothing to support their actions except their own opinion that it was a breach of the peace for petitioners to sit peacefully in a place where custom decreed they should not sit. Such activity, and the circumstances of these cases, is not evidence of any kind, and cannot be so considered either by the police or by the courts."

In sharp contrast with *Garner*, the facts in the instant case amply sustain appellant's conviction under Code §2087.5. The evidence shows that the officer arrested the defendant in good faith, under reasonable apprehension of an imminent breach of the peace.

We are cognizant of Edwards v. South Carolina, 372 U.S. 229, 9 L. Ed. 2d 697, 83 S. Ct. 680 (1962), where 187 Negroes, charged under the common-law crime of breach of the peace, were convicted under the following facts: The defendants gathered at a church and then walked to the South Carolina Statehouse grounds in Columbia, the capital. Their purpose was to protest their dissatisfaction with alleged discriminatory actions against Negroes. Thirty-six officers were present, and they were permitted within the next thirty or forty minutes to walk single file or two abreast in an orderly way through the grounds, carrying placards. During this time 200 to 300 onlookers had collected, and during this period, there was no evidence to suggest threats, but mere curiosity. The police advised the defendants that unless they dispersed within fifteen minutes they would be arrested. The Negroes declined to do so, and they were arrested. The Supreme Court of South Carolina affirmed the conviction. The United States Supreme Court on appeal accepted the South Carolina court's decision that the petitioners' conduct constituted a breach of the peace under the State law. But, on an independent examination of the record, it concluded that South Carolina infringed petitioner's constitutionally protected right of freedom of speech and assembly, and freedom to petition for redress of grievances. *Edwards* did not involve any substantial problem of balancing First Amendment rights against the police power of the state. The instant case, on the contrary, requires us to apply facts in a different context.

 ██ The question here is whether a state is constitutionally prohibited from enforcing laws to prevent breach of the peace in a situation where city officials in good faith believed, and the record shows without dispute, that disorder and violence were imminent, merely because the activities constituting that breach involve claimed elements of constitutionally protected speech

and assembly. The answer, we think, is clearly in the negative, on the basis of the undisputed facts in this record. The constitutional rights of appellant to assemble with others and to freely express his views are manifest. Yet they are and must be subject to the preservation of good order, under the police power of the state, where violence and disorder are imminent.

In People v. Kopezak, 274 N. Y. S. 629, the Court held that, although defendants had the right as a group to gather or assemble for lawful purposes to protect in peaceful manner against injustices or oppressions, nevertheless, their walking up and down the street in front of their landlord's premises, carrying signs asking for a rent-strike against firetrap conditions, constituted disorderly conduct.

People v. Levner, 30 N. Y. S. 2d 487, involved hundreds of pickets, members of a union and of organizations with similar interests, who gathered with placards to picket the mayor's home at a time when he was on vacation. It was held there was justification for the police officer's order for them to disperse, and those who refused to obey were properly found guilty of disorderly conduct. The Court pointed out that a police officer need not wait to take action until the crime or disorder has occurred, since his obligation is also preventive, and that the constitutional rights of peaceful assembly and freedom of speech did not permit the defendants to violate a law against disorderly conduct.

In People v. Richards, 177 Misc. 912, 31 N. Y. S. 2d 457, where a Long Island State Park Commission concessionaire operated a restaurant as a necessary facility in a state park, there was no labor dispute in the record. Picketing of park restaurant by female pickets in bathing suits carrying signs for the purpose of secondary boycott caused large crowds to gather. The disobeying of an order of park patrolmen constituted disorderly conduct, and a violation of an ordinance of the commis-

sion prohibiting display of advertising in parks and prohibiting parades except by permit in parks and requiring all persons to obey orders of local park officers did not violate the defendants' right of assembly and free speech; since these rights are relative and may be regulated in the interest of all, and must be exercised in subordination to the general comfort and convenience and in consonance with peace and good order.

In People v. Burman, 154 Mich. 150, 117 N. W. 589, where the court was considering a conviction of a defendant for carrying a red flag in a parade in violation of an ordinance relating to riots and disturbances, etc., (but which did not in turn refer to the carrying of red flags) it was held that the carrying of red flags in the parade violated the ordinance, and there is no constitutional right to display a red flag in a procession where those composing the procession know that the natural and inevitable consequence will be to disturb the public peace and tranquility, in violation of the ordinance. Freedom of speech and assembly are not absolute, but may be restricted under the police power of the state. Whitney v. California, 274 U. S. 357, 71 L. Ed. 1095, 47 S. Ct. 641; Hughes v. Superior Court, 339 U. S. 460, 94 L. Ed. 985, 70 S. Ct. 718; International Brotherhood v. T.C.W.H. Union & Hanke, 339 U. S. 470, 94 L. Ed. 995, 70 S. Ct. 773; State v. Sugarman, 126 Minn. 777, 148 N. W. 466.

In People v. McWilliams, 22 N. Y. S. 2d 571 (1940), the defendant was arrested under a charge of making an anti-Semitic speech in violation of New York's disorderly conduct statute, §722, Subsecs. 1, 2, of the New York Penal Law, viz:

"Section 722 of the Penal Law reads in part as follows:

"Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be

deemed to have committed the offense of disorderly conduct:

"1. Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior;

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; * * *."

The Court's opinion stated: "As recently stated by the Court of Appeals in a case under section 722, 'acts charged as disorderly conduct must be public in character, and such as actually do tend to disturb the public peace and quiet.' People v. Monnier, 280 N. Y. 77, at pages 78 and 79, 19 N. E. 2d 789, 790.

"It is not essential that there be an actual breach of the peace. People v. Nesin, 179 App. Div. 869, 167 N.Y.S. 49; People v. Bevins, 74 Misc. 377, 134 N. Y. S. 212, affirmed 149 App. Div. 935, 134 N. Y. S. 1141.

"The test in each case is whether the defendant's conduct under the circumstances is likely to lead to disorder or public disturbance. It will be seen that, in applying this test, the courts have necessarily passed judgment upon the competing social interests that would be served by the defendant's freedom of action, and those served by penalizing his conduct and utterances as objectionable.

"It has also been held that to violate the statute, the threat need not be verbal; it may derive its significance from the circumstances. People v. Sinclair, 86 Misc. 426, at page 435, 149 N. Y. S. 54, affirmed People on Complaint of Wilson v. Sinclair, 167 App. Div. 899, 151 N. Y. S. 1136.

"The right to assemble peaceably in the streets and public places of the city, like the right to distribute literature, is protected against state interference by the Federal Constitution. Hague v. Committee for Industrial Organization, 307 U. S. 496, 59 S. Ct. 954, 964, 83 L. Ed. 1423.

"In that case, however, the court specifically said that this right 'may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order.'

\* \* \* \* \* \*

"As in the case of all 'relative' rights, the point at which conduct in the course of a meeting becomes unlawful must be ascertained by the words employed, the intent of the speaker, the reaction of those there assembled and to some extent, where necessary, by balancing conflicting social interests. Against the public interest in freedom of discussion, it is necessary to weigh 'general comfort and convenience' and the 'peace and good order' of the community \* \* \*

"The opinion thus recognizes not only the power of the State to punish abuses of the right, but its duty to maintain order in connection with street meetings. That duty is discharged, in this State, by the enforcement of section 722 of the Penal Law."

In summary, we hold that the constitutional rights of defendant were not violated by his conviction for disorderly conduct. The state's interest in preventing violence and disorder, which were imminent under the undisputed facts, is the vital and controlling fact in this case. If the defendant had been denied the exercise of his right to enter the white waiting room, or to assemble for the purpose of exercising the right to protest or of free speech, his argument would be pertinent. But defendant is in no position to claim that he was merely exercising a constitutionally guaranteed right, for it is manifestly true that he and his associates participated in a highly sophisticated plan to travel through the South and stir up racial strife and violence. All of their activities were broadcast in a manner to create the greatest public commotion and uneasiness. When defendant and his companions reached Jackson, the

police had notice of all that had transpired in Alabama. There is no evidence that the police did anything other than keep the peace. They did not deny defendant the right to enter the white waiting room and were willing and ready to escort defendant anywhere he wanted to go. This Court cannot escape the duty to accord to the police the authority necessary to prevent violence, and this is true whatever the motives of those who are about to cause the violence, or to precipitate it. In the situation the police found themselves, it was reasonable to require defendant to move on to wherever he wanted to go.

## III.

Finally, it is contended that the statute (§2087.5) under which defendant was prosecuted is so vague and uncertain that it is void and unenforceable. Mississippi has not yet passed on this question, but it appears that our statute is somewhat similar to that of the New York Penal Law, Consol. Laws, pp. 383-4 § 722.

The New York court pointed out in People v. Hussock, 23 N. Y. 2d 520, cert. den., 312 U. S. 659, 61 S. Ct. 733, 85 L. Ed. 1107, that, "It is clear from the record that although the complaint especially charged a violation of subdivision 2 of said Section 722, the Court found defendant guilty of refusing to move on when ordered so to do by the policeman. In other words, the conviction was based upon a violation of Subsection 3 of said Section 722, pursuant to which a person may be adjudged guilty of disorderly conduct 'who congregates with others on a public street and refuses to move on when ordered by the police." * * * A great deal of appellant's brief is taken up by the contention that Section 722 as applied by the Court below is unconstitutional in that it deprives defendant of his liberty of assembly, freedom of speech and of the press and of his liberty to worship according to the dictates of his conscience. * * * From a reading of the record we

are of the opinion that defendant was properly convicted * * *''.

In United States v. Harriss, 347 U.S. 612, the Court held: ''If the general class of offenses as to which a statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise.'' See: Roth v. United States, 354 U. S. 476; Winters v. New York, 333 U. S. 507.

After careful analysis of §2087.5, Miss. Code 1942, Rec., we conclude that it is not vague and indefinite, and does not deny appellant in this respect due process of law under the Fourteenth Amendment to the Constitution of the United States. The act points out in specific terms the elements of the offense and the constituent elements of it. See Amsterdam, The Void for Vagueness Doctrine, 109 U. of Pa. L. Rev. 67 (1960), reprinted in Selected Essays on Constitutional Law, pp. 560-599 (1963).

We are therefore of the opinion that the order of the circuit court affirming the judgment and conviction of the defendant in the county court should be affirmed.

Conviction and sentence of defendant affirmed.

All Justices concur.

Note 1.

Under the authorities of this State, this Court can take judicial notice of historical facts. Day v. Smith, 87 Miss. 395, 39 So. 526; Clark & Company v. Miller, 154 Miss. 233, 122 So. 475; Moore v. Grillis, 205 Miss. 865, 39 So. 2d 505, 10 A. L. R. 2d 1425. This Court does take notice that the citizens of Mississippi later (September 30, 1962) underwent the shock of such a riot at the University of Mississippi, in which lives were lost and property was damaged. The President of the United States sent into Mississippi some 32,000 regular Army troops, and these troops remained in Mississippi for many months.

BRADY, J., specially concurring:

I concur in the opinion of my colleagues, and suggest these additional reasons why the verdict and sentence of the trial court should be affirmed.

An objective, factual analysis of the circumstances which existed at the time appellant was arrested clearly and unequivocally distinguishes this case from the cases relied upon by appellant in support of his contention that his arrest was illegal, and violated his constitutional rights of speech, assembly, non-segregated travel in interstate commerce, and the due process clause of the Fourteenth Amendment.

The cases cited in the majority opinion are *Garner v. Louisiana,* where two Negro students took seats at a lunch counter in a drugstore; *Briscoe v. Louisiana,* where seven students sought service in the restaurant portion of a Greyhound Bus Terminal; *Hoston v. Louisiana,* where seven Negro students took seats at a lunch counter in a variety store; and *Taylor v. Louisiana,* where four Negroes went into the white waiting room of a bus depot leaving two companions outside sitting in the car which had brought all six to the station.

The records prove that in all of the four cases cited above the petitioners did absolutely nothing but seat themselves and ask to be served. There is no trail of turmoil and violence following the petitioners along their routs to their destinations. No national racial organizations were financing and master-minding their courses of action as in the case at bar. No National Guardsmen accompanied the other petitioners, in a bus, in order that safe travel might be afforded them, as was the case here. In these four cases and all others cited by appellant there were no anticipated, large-scale, exacerbated conflicts, no deliberate mass generation of strife and turmoil, no sectional campaign strategy involving several sovereign states with premeditated interstate movements synchronized and methodically executed

step by step, which, when interrupted by mob violence, required a retreat and reforming of plans and procedures and a recoaching and retutoring of the participants — all of which is shown to exist in the case at bar.

In the four above cited cases, and in all the other cases cited by appellant, we find the foregoing evidentiary facts wanting. In addition thereto, in the cases relied upon by appellant there was not, as is in the case at bar, a nationwide, hourly publicity program carried on through the media of television and radio hook-ups, which on the hour or half-hour interrupted all programs to propagandize and publicize the misnamed "Freedom Riders" sorties. In the cases cited by appellant there were no fourteen hundred National Guardsmen called into service to prevent mob violence, — or seventy-five policemen who had to be detailed to the bus stations to isolate the same by a cordon from contact with any persons save those properly using the terminal.

The Attorney General's Office and the Justice Department played no part in the four and other cases, but in the case at bar a vital role was played and Department of Justice officers accompanied the riders. In the four and other cases cited by appellant there was little or no concern or excitement, while in the case at bar, because of the publicity, propaganda, trail of violence aforesaid, excitement and feeling had risen to a fever pitch so that when the buses arrived carrying appellant (and his fourteen confederates), all appellant had to do was to demurely enter the bus station like a marionette with his fourteen confederates. The stage of violence had already been set.

The perfectly executed, premeditated scheme of appellant, his associates, and affiliates, in which he played a leading role, had already created by the aforesaid propaganda a highly volatile and explosive condition at the bus station in Jackson, Mississippi, and the slightest incident would have triggered the potential violence which would have generated into a bloody riot.

The evidentiary support essential to justify the arrest of the appellant was present. The order of the policeman to move on was justified, not because of any subjective conclusion in his mind, but by the objection realization that a violent breach of the peace was imminent.

The case of Edwards v. South Carolina can afford but little benefit to appellant for the reason that although there were one hundred and eighty-seven Negroes who had left their church and had walked single file or two abreast around the Capitol grounds in an orderly manner carrying placards protesting discriminatory action against Negroes, the case is completely devoid of any of the premeditation, propaganda, exciting of public feeling, acts of violence, and impending bloodshed as was present in this case. In *Edwards* the police acted after thirty or forty minutes of continuous parading because a curious crowd of some two or three hundred persons had collected on the streets to watch the picketing. The officers subjectively decided that the marching would have to stop and the marchers disperse within fifteen minutes or be arrested. The marchers did not desist and were arrested. There was absolutely no impending violence shown at the time of the arrest, but only the possibility that it might arise. The distinction between Edwards and this case is too obvious to merit further consideration.

The transcendent issue presented here is: Can a nonresident citizen, in a deliberate effort to prove a statute of a state unconstitutional, while traveling in interstate commerce, violate with impunity that statute and other statutes regulating the maintenance of peace, order and tranquility within that State, and thus supersede or nullify the State's right to regulate and control its internal domestic affairs?

It is a corollary of durable judicial administration that the judiciary must guard and protect the respec-

tive limited powers of the separate branches of our State and Federal governments, of which it is a part, and not be an instrument for, or participate in, any procedure or function which is deliberately calculated to alter or destroy by judicial decree or fiat the very foundations upon which that representative government reposes, and which likewise insures the continued lawful and wise operation of that judiciary. It is inherent in self-government that a State shall possess the essential police powers and the right to exercise the same in the maintenance of peace and order and in regulating and conducting its domestic affairs. Mass demonstrations, or threats thereof, intimidations, altercations and violence, or conduct calculated to incite and produce the same, are the antithesis of self-government under the law geared to the maintenance of peaceful and orderly existence.

These strife-fomenting junkets, planned by individuals and groups erroneously called "freedom riders," and poorly disguised as an exercise of constitutional guarantees, are the harbingers of government operation, not under law but under groups of men or committees, the highest expression of which is represented by the Communist order, throughout the world.

The collective rights of the citizens to enjoy peace and order and be protected from breaches thereof are synonomous with the State's duty and right to maintain peace, order and tranquility in its domestic affairs. There is nothing in the Constitution of the United States or amendments thereto, and particularly the fourteenth amendment, which gives preference to the individual rights of the citizens of the various States over their collective rights as citizens thereof. As yet the rights of the individual citizen of this country are not absolute and must yield to the rights of the majority of citizens.

If there be a paramount right essential to the maintenance of orderly and peaceful self-government in the

various states, it must be the right of the State to see that its citizens are safe in their persons and in their property from nationwide mass demonstrations, intimidations, breaches of the peace and from disorderly conduct deliberately planned and calculated to cause breaches of the peace and actual violence. The degree to which this collective right of the citizens is successfully protected by the States and subdivisions thereof varies directly with their respective authority and power to maintain peaceful and orderly conduct among all citizens — the primary objective of self-government.

In order that the sacred individual rights of the citizens may not be impaired and may endure, it is imperative that the various states be permitted to perform their inherent, common-law duties and prerogatives of maintaining peace and order among their citizens in all their varied personal contacts and associations. The failure, refusal, or prohibition of performance of this high duty of maintaining peace, tranquility, law and order on the part of the States or the political subdivisions thereof is a positive, certain and swift way to destroy completely all local and State governments which compose this nation, and thus create uncontrollable, endless turmoil and violence and its inescapable ultimate — a ruthless, totalitarian or monolithic State where the rights of the regimented individual count for naught.

Today when whirlwinds of strife, rebellion and revolution are shaking the foundations of most of the civilized nations of the world, because of the inability, or a complete failure on the part of those nations and subdivisions thereof to maintain peaceful and orderly conduct in the usual and customary life of its citizens, we solemnly assert that the premeditated plans of a group of nonresident citizens, regardless of their social beliefs, political power or philosophy, economic or ethnic status to create strife and violence in order to test the constitutionality of State laws or city ordinances, can-

not thereby vitiate or destroy the sacred, nondelegable, inexorable duty which a city or State owes to all its citizens to maintain peace and order. We hold this to be true even though the group of nonresident citizens assert the subtle subterfuge that they are merely exercising their constitutional rights of freedom of speech, assembly, and uninhibited passage in interstate commerce in justification of their premeditated and well executed conspiratory scheme.

A State which cannot, or will not, protect the safety of all citizens and their property rights, which cannot, or will not, exercise its inherent common-law police powers reserved and guaranteed to it, to regulate its internal domestic affairs in such a situation as is presented here, has already lost its attributes and characteristics as a sovereign state. It is, in fact, no longer a State but some type of unautonomous association which exists merely because of the sufferance of an all-powerful entity which tolerates its existence.

With proper deference to all concerned, regardless of constitutional subterfuge, legal sophistry, or judicial legerdemain, the communal, sinister and divisive plots to create antagonisms, to breed hatred, and produce violence and bloodshed in this State among peoples of different racial origin who have lived together harmoniously for almost 200 years shall not become stark realities through failure of this Court to recognize the inviolate constitutional rights of the citizens of this and other states to lawfully maintain peace, order and tranquility in their domestic affairs by punishing those persons who deliberately flaunt and violate their laws governing the same, and who simultaneously demand constitutional immunity to do so.

For these additional reasons, in my opinion, the judgment of the trial court is affirmed.

*McElroy and Rodgers, JJ.,* join in this opinion.

## ON MOTION FOR ENTRY OF JUDGMENT

RODGERS, J.:

Each of the following appellants appealed to the Supreme Court of the United States from a judgment of this Court in the respective causes, wherein this Court affirmed judgments of the County and Circuit Courts of the First Judicial District of Hinds County, Mississippi, in which each respective appellant was convicted of a breach of the peace.

The judgment of this Court has been reversed by the judgment of the Supreme Court of the United States in each of the causes, and the mandate of that Court has been filed with this Court, wherein each of the respective appellants has been allowed costs of appeal in the sum of $100.00.

Now, therefore, in obedience to the mandate of the United States Supreme Court, each of the following named defendants is discharged, and his appearance bond released:

| | |
|---|---|
| Henry J. Thomas v. State of Mississippi | No. 42,987 |
| James L. Farmer v. State of Mississippi | No. 42,983 |
| John Lee Copeland v. State of Mississippi | No. 42,722 |
| Ernest Patton, Jr. v. State of Mississippi | No. 42,956 |
| Grady H. Donald v. State of Mississippi | No. 42,951 |
| Peter M. Ackerberg v. State of Mississippi | No. 42,984 |
| James Luther Bevel v. State of Mississippi | No. 42,960 |
| Charles David Myers v. State of Mississippi | No. 42,968 |
| Carolyn Yvonne Reed v. State of Mississippi | No. 43,031 |
| John J. McDonald v. State of Mississippi | No. 42,970 |
| Raymond B. Randolph, Jr. v. State of Mississippi | No. 43,032 |
| Alexander M. Anderson v. State of Mississippi | No. 42,985 |
| William E. Harbour v. State of Mississippi | No. 42,963 |
| Zev Aelony v. State of Mississippi | No. 42,980 |
| Marion Allen Davido v. State of Mississippi | No. 42,723 |

Claire O'Conner v. State of Mississippi No. 42,982
David Kerr Morton v. State of Mississippi No. 42,973
Katherine A. Pleune v. State of Mississippi No. 42,957
Robert Earl Filner v. State of Mississippi No. 42,978
Sanda M. Nixon v. State of Mississippi No. 42,966
Terry Susan Perlman v. State of
 Mississippi No. 42,961
Lestra Alene Peterson v. State of
 Mississippi No. 43,034
Thomas Van Roland v. State of Mississippi No. 43,029
Joan Frances Pleune v. State of
 Mississippi No. 43,036
Grant Harlan Muse, Jr. v. State of
 Mississippi No. 42,975
Pauline Edythe Knight v. State of
 Mississippi No. 42,958
Edward J. Bromberg v. State of Mississippi No. 42,967
Lester G. McKinnie v. State of Mississippi No. 42,971
Elizabeth S. Adler v. State of Mississippi No. 42,999

Reversed, defendants discharged with their reasonable costs.

All Justices concur.